**AMOCO PRODUCTION COMPANY et al., Petitioners,**

v.

**Morris BRASLAU et al., Respondents.**

**No. B-6786.**

Supreme Court of Texas.

Feb. 1, 1978.

Clark & Tartaglia, W. Scott Clark, Fort Worth, for petitioners.

James E. Klager, Corpus Christi, Ellis, Andrews & Lawrence, Thomas M. Andrews, Aransas Pass, for respondents.

GREENHILL, Chief Justice.

In this oil and gas case, the problem is whether term royalties expired because there was a cessation of production after the expiration of the primary terms of the term royalty deeds. Our holding is that while production did cease, there is evidence to support the trial court's finding that there was but a temporary cessation; and consequently the term royalties did not expire. As will be indicated below, the holding under the particular facts is one of first impression; and it extends our previous holdings on temporary cessation of production.

Amoco Production Company and others [Amoco] are the owners of term royalties in Frank Braslau Gas Unit in Live Oak County. They brought a declaratory judgment to determine whether the cessation of production after the primary term had caused their term royalties to expire. If they did expire, these interests reverted to the Braslaus and the Kugerls.

Trial was to the court without a jury. The judgment included findings that reworking operations on the well in question were begun and continued with diligence and good faith; that production from the gas unit was restored within a reasonable time, and that the cessation of production was temporary. The holding was that the term royalty interest did not expire.

The Court of Civil Appeals reversed. It rendered judgment that because of the cessation of production, the term royalties expired. 549 S.W.2d 260. We granted the writ of error of the Amoco group.

There is little dispute in the facts, and most of them are stipulated. By instruments dated September 2, 1946, and February 4, 1958, Frank and Morris Braslau conveyed the term royalties now owned by the Amoco group. Also on February 4, 1958, John and Anna Kugerl executed a term royalty deed to other property within the same Frank Braslau Gas Unit. Each of the grants was for a period of 15 years and as long as oil or gas was produced from the lands described. If at the end of the 15 year term there was no such production from "the lands described," the term royalties terminated.

The unit operator, Atlantic Richfield Company [Arco], drilled and completed what we will call Well Number One. Dur-

ing the drilling of the well, the well logs contained "positive showings" of four producing sands. We shall call the four sands A, B, C, and D, and their depths are here approximated.

Sand A [the Wilcox] was at 7,700 feet. Sand B [the Slick] was at 7,800 feet. Sand C [the Mackhank] was at 8,500 feet; and Sand D [the Massive] was at 8,800 feet.

As Well Number One was being drilled, it reached the 8,550 foot sand, Sand C. When this depth was reached, the testimony is that the well "started to kick and started to blow out." That meant to the testifying consulting geologist that these occurrences were "a very good show" of a producing sand. He further testified that the drillers "tried to balance the drilling, to hold back the pressure so they could go ahead and penetrate the sand." This meant to the witness that these occurrences gave "an indication of production."

The drillers were able to control the well, and they drilled through Sand C to the deeper Sand D at 8,800 feet.

The witness further testified, and his testimony is undisputed, that there were "probably four sands [capable of production] in the well at that time."

The well was ultimately completed in Zones B and D; i. e., in the 7,800 foot [Slick] sand and in the deepest sand, the 8,800 foot [Massive] sand. The well was not then completed in the shallowest sand, Sand A, or in the 8,500 foot Sand C [the Mackhank].

The testimony is that the operators intended ultimately to produce from all four sands sequentially through the same well bore of Well Number One.

Production from Sands B and D commenced during the 15 year primary term of the term royalties in question and continued until August of 1971. At that time, the production from Zone B was depleted. On October 9, 1972, Arco, the operator, notified the owner of the working interest that production from Zone D, the deepest sand, was

becoming marginal because of the high cost of handling the water produced with the oil.* So at that time, Arco decided to complete the same well in the other two zones, A and C.

Production ceased from the deepest Zone D on November 13, 1972; and work was begun the next day to recomplete the well in the other two zones.

However, Well Number One was "lost" due to mechanical difficulties in trying to recomplete the well. The casing collapsed inside the well bore.

Without delay, Arco obtained permission from the Railroad Commission to "move over" 700 feet on the same "said land" in order to produce from Zone C, the Mackhank sand at approximately 8,500 feet. This Well Number Two, begun on January 12, 1973, was completed in Zone C on February 17, 1973. Commercial production was begun from Zone C on February 24, 1973, approximately 20 days after the expiration of the last of the 15 year primary terms provided for in the term royalty agreements.

Subsequently, a third well was completed on "said land" by Arco to produce from Zone A, the shallowest of the sands. Both these wells produced continuously, and were producing at the time of this suit. There is also evidence that Zone A was productive in the immediate area because of production from a well on an adjacent tract. The problem, then, is whether there was a termination of the term royalties because there was no production for 103 days or approximately three and a half months, and because production, when resumed, was from a different sand.

The owners of the term royalties contend, as the trial court held, that there was but a temporary cessation of production from known sands or zones. The owners of the reversionary interests contend that there had not been *any* production from Zones A and C; and that it is impermissible to call it a temporary cessation of production if it is

---

* While the unit involved is designated as a Gas Unit, some oil was produced from Well Number One. What was produced is immaterial here, whether oil or gas.

necessary to drill a second well to produce from a separate zone.

Our view is that the term royalty agreement speaks in terms of production from "said land," or "the lands described," and not from any particular zone or sand. But the term royalty is in the nature of a determinable fee; and if "production" ceases, the interest terminates by its own terms. The courts have ingrafted upon that concept the holding that temporary cessation of production will not trigger the extinction of the interest.

We turn now to the cases. If there is a cessation of production after the primary term, which is not a temporary one, the estate terminates. This was the holding of *Watson v. Rockmill*, 137 Tex. 565, 155 S.W.2d 783 (1941), in which there was a cessation of two years and seven months. The cause was not any mechanical failure but a severe depression in the price of oil.[1]

In *Holchak v. Clark*, 284 S.W.2d 399 (Tex. Civ.App.1955, writ refused), oil was "discovered" (a favorable drill stem test) during the primary term, but there was *no* production in paying quantities during the primary term. After the primary term had expired, a second well was drilled into another sand or zone, and it was productive. The holding was that the royalty interest terminated. The emphasis was upon the difference between oil "discovered" during the primary term, and oil "produced." There being no production during, or upon the expiration of the primary term, the royalty interest terminated. The opinion commented upon the absence of a "continuous drilling" provision in the instrument; i. e., that if oil were discovered, it would be sufficient if the operator thereafter proceeded with diligence until production was obtained even after the expiration of the

primary term. The court would not write such a provision into the contract for the parties; and the Court of Civil Appeals in this case considered the *Holchak* case and that language to be determinative of this case.

Also helpful to *Braslau, et al.,* are *Gulf Oil Co. v. Reid*, 161 Tex. 51, 337 S.W.2d 267 (1960), and *Archer County v. Webb*, 161 Tex. 210, 338 S.W.2d 435 (1960). In *Gulf v. Reid*, the lease had a 5 year primary term. Gulf began a well toward the end of the term and completed it as a gas well after the end of the term. The well was capped because there was no pipeline connection or ready market for the gas. Shut-in royalties were tendered four months after the end of the primary term, and a pipeline connection was secured some five months after the well was completed. By a divided court, it was held that the lease was terminated. The interest conveyed was a determinable fee; and since there was no *production* at the end of the term, and no prompt tender of the shut-in royalty, the lease terminated.[2]

In *Archer County v. Webb*, cited above, the oil and gas lease was for a primary term of 10 years, and contained a provision that if gas were discovered, the lessee could pay $50 per well per year in lieu of production. A separate instrument, a term royalty, provided for a share of the production for 15 years and as long as oil or gas was *produced.* The term royalty did not contain the shut-in gas royalty provision. Gas production was obtained; the well or wells were capped; and the shut-in royalties were paid or tendered. The holding was that term royalty, a determinable fee interest, terminated because there was no actual production after the primary term. Shut-in royalty payments were not "production" after the primary term as far as the term

---

1. *Watson v. Rockmill* and the problems of temporary cessation of production are discussed in Williams, 30.1 Oil and Gas Law Sections 602 and 604 (1977); and in Hazlett, "Effect of Temporary Cessation on Leases and Term Royalties," Southwestern Legal Foundation, Tenth Annual Institute on Oil and Gas Law and Taxation 201 (1959), where the author suggests a "rule of reason."

2. This writer and two other justices were in dissent in *Gulf v. Reid.* The same three justices dissented also in *Archer County v. Webb*, a 5 to 3 decision. These two opinions are assumed to be the law in this case.

royalty was concerned. The *Archer County* case and *Gulf v. Reid* are illustrative of this court's view of holding the parties to their agreements rather strictly.

The main cases for the opposing view are *Midwest Oil Corp. v. Winsauer*, 159 Tex. 560, 323 S.W.2d 944 (1959); and *Stuart v. Pundt*, 338 S.W.2d 167 (Tex.Civ.App.1960, writ refused). Both of these cases distinguish the *Holchak* opinion discussed above.

In *Midwest v. Winsauer,* the mineral interest was a term royalty, as we have here. The term royalty was for a primary term of 15 years, and as long thereafter as oil or gas were produced. There was production beyond the temporary term followed by a cessation of production due to mechanical problems and litigation. The trial court had rendered a judgment that the term royalty had expired. This court held that from the facts adduced, the cessation, as a matter of law, was temporary; and that the term royalty did not terminate. The opinion says,

"Although the royalty deed . . . does not expressly provide that the term royalty will not terminate because of temporary interruptions, we hold that such a provision is necessarily implied." 323 S.W.2d at 946.

This court then distinguished *Holchak* and another case. Referring to those cases, our opinion states,

"Neither of these cases deal with the question of cessation of production, either temporary or permanent. The question in the *Holchak* case, *supra*, was 'whether there was paying production from the land [at the end of the primary term]'. . . . The court simply held [in *Holchak*] there was no production whatever from the premises." 323 S.W.2d at 948.

The same could be said of the opinion in *Gulf v. Reid* and in *Archer County v. Webb*. Accordingly those cases are distinguished.

Finally we come to *Stuart v. Pundt*, 338 S.W.2d 167 (1960), an opinion of the San Antonio Court of Civil Appeals in which a writ was refused. It is regarded as the case nearest in point. While there are some distinguishing facts, we base the decision in this case upon that opinion and upon the *Winsauer* case discussed above.

In *Stuart v. Pundt*, the mineral interest involved was also a term royalty. There was substantial gas production during the primary term. Then the well became clogged, and gas could not be produced. As here, during the reworking operations of the well, the casing in the well collapsed. About a month after the casing collapsed, the operator obtained a permit to drill a new well on the same land. The new well was completed without delay in the same sand or zone from which the first well had produced,—and that is a distinguishing feature between that case and this case.

The holding in *Stuart v. Pundt* was that the mechanical difficulties and the prompt drilling of the new well constituted a temporary cessation of production; i. e., that there was no termination of the mineral interest (the term royalty) even though production was from a new or different well. That court again distinguished *Holchak* and *Archer County v. Webb*.

We are persuaded that the holding in *Stuart v. Pundt* should be followed even though the new well here was completed in a sand or zone different from that from which the first well was actually produced. The production must have been from "said land," or "the lands described," as it was.

We do not have before us the extension or preservation of a term royalty during a period of further or deeper exploration. The Sand or Zone C, the Mackhank, was definitely encountered during the drilling of Well Number One to the extent that the driller feared a blowout of the well. While there was no production from that zone or sand in Well Number One, the reasoning of *Stuart v. Pundt* convinces us that the term royalty should not be terminated due to a temporary cessation of production when the operator was attempting to move up in the well and to obtain production in Well Number One in Zone C. The well was lost, and the operator promptly moved over and obtained production from "said land" in Zone C. As stated, the fact findings of the trial court are that there was a temporary

**810**

cessation and due diligence; and there is ample evidence to support these findings.

Accordingly, the judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.