Rosa Vela De BENAVIDES, et al., Appellants,

v.

Lynne A. WARREN, et al., Appellees.

No. 04-82-00405-CV.

Court of Appeals of Texas, San Antonio.

April 25, 1984.

Rehearing Denied May 23, 1984.

 

 
 
 

 

 

 
 
 

 

 

 
 

 

 
 

 

 
 

 

 

 

 

Lawrence A. Mann, Mann, Dickinson & Saldana, Laredo, for appellants.

James L. Drought, Brite, Drought, Bobbitt & Halter, W.W. Fowlkes, San Antonio, for appellees.

Before CADENA, C.J., and BUTTS and DIAL, JJ.

## OPINION

BUTTS, Justice.

Plaintiffs, Rosa Vela De Benavides, Carlos Y. Benavides, Alfonso N. Benavides, Arturo T. Benavides, Beatriz S. Benavides, Carlos Y. Benavides, Jr., Individually and as Trustee, and Arturo N. Benavides, Individually and as Trustee, sued for a declaratory judgment in this oil and gas case to determine whether term royalties had terminated. Defendants, Lynne A. Warren, Wendy A. Warren, Andrea R. Warren, Arthur Lykes Sentz, James N.L. Sentz, Patricia Sentz Sharpsteen, and Virginia G. Moriarty, all descendants of A.M. Sentz, countersued for an accounting, asking that a constructive trust be imposed upon royalty payments claimed by defendants to belong to them. Edwin L. Cox, the other defendant, an oil leasehold operator of lands involved in this suit, did not appeal the judgment that royalty payments, held in suspension by him since 1979, be paid to the named descendants of A.M. Sentz in their proportionate shares. The trial court rendered a declaratory judgment in favor of the defendants granting their counterclaim and prejudgment interest. The plaintiffs appeal. We affirm.

Plaintiffs include Rosa Vela De Benavides, the original grantor of the royalty deed, dated March 19, 1923, to A.M. Sentz. She is predecessor in title to the other plaintiffs. She executed the subject royalty conveyance which granted a 1/16th non-participating royalty interest in oil, gas and other minerals produced from more than 10,000 acres of land in several tracts spanning three south Texas counties. The royalty deed provided in part:

\* \* \* \* \* \*

... This sale and assignment is made for the full period of ten years from the date hereof, unless during said period oil, gas or other minerals are produced and saved from said land and premises, in paying quantities, in which event this sale and assignment is to continue so long as said oil, gas and other minerals are produced in paying quantities; and is made subject to all oil and gas leases now on said premises, or which may hereafter be made by me on said premises ... and does not in any way impair my right to make any lease, or leases which I may execute thereon. I do hereby bind myself, my heirs, executors and administrators to warrant and forever defend, all and singular the said title unto A.M. Sentz, his heirs and assigns.

\* \* \* \* \* \*

The grant created a royalty interest, that interest terminating unless minerals were produced in paying quantities during the ten year period, the royalty interest continuing so long as such production existed. It was a non-participating interest, and the plaintiffs retained the executive right to execute mineral leases. *See Upshaw v. Norsworthy*, 267 S.W.2d 566 (Tex.Civ.App.—Eastland 1954, writ ref'd n.r.e.); H. WILLIAMS & C. MEYER, OIL AND GAS LAW § 338 (rev. 1983). It is undisputed that minerals were produced in paying quantities during the primary term.

Plaintiffs bring seven points of error, five of them attacking the findings of fact as not supported by legally and factually sufficient evidence, and also attacking certain holdings (conclusions of law). The last two points address the propriety of the award of royalty payments to defendants and the award of prejudgment interest.

### REVIEW OF FINDINGS OF FACT

■ Findings of fact have the same force and effect as jury answers to special issues and are treated with the same dignity on appellate review. 4 R. McDONALD, TEXAS CIVIL PRACTICE § 16.05 (1971). Unchallenged findings are binding on appeal. *Whitten v. Alling & Cory Co.*, 526 S.W.2d 245, 248 (Tex.Civ.App.—Tyler 1975, writ ref'd).

■ In arriving at its findings, the trial court may accept or reject any or all of the testimony of a witness. *Electro-Hydraulics Corp. of America v. Special Equipment Engineers, Inc.*, 411 S.W.2d 382, 387 (Tex.Civ.App.—Waco 1967, writ ref'd n.r. e.).

■ Under a "no evidence" challenge to the finding, the appellate court considers only the evidence, and reasonable inferences therefrom, tending to support the finding and disregards all evidence and inferences to the contrary. *Ray v. Farmers' State Bank of Hart*, 576 S.W.2d 607, 609 (Tex.1979). Where there is at least some evidence of probative force to support the finding under a "no evidence" attack, it is binding. *Id.* at 609–610.

■ When a finding is attacked as not being supported by factually sufficient evidence, the appellate court must consider all of the evidence. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). The finding will be upheld unless it is so against the great weight and preponderance of the evidence as to be clearly and manifestly wrong. *In re Kings Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Houston Natural Gas Corp. v. Pearce*, 311 S.W.2d 899, 903 (Tex.Civ.App.—Houston 1958, writ ref'd n.r.e.).

Plaintiffs first challenge three findings of fact as legally and factually insufficient:

### Findings of Fact

7. Plaintiffs did not prove any cessation of production from each and every tract included in the Royalty Deed at any time.

8. No production of oil and gas from the lands included in the Royalty Deed or lands pooled or unitized therewith, was shown to have been in less than paying quantities.

20. In December of 1971, Mayfield commenced the Mayfield B–1 well, which was completed and which produced gas, on February 10, 1972.

At the bench trial the parties stipulated: The plaintiffs and defendants with reference to the Deed of March 19, 1923, which is the subject of this lawsuit, [stipulate] that the only period of time, from the date of the deed to the present, during which plaintiffs contend that there was a cessation of production in paying quantities from land covered by the Deed, was between December 31, 1970 and July, 1972.

Thus, the plaintiffs sought a declaratory judgment that production in paying quantities had ceased, thereby nullifying the royalty deed, the period of cessation occurring after December 31, 1970. The burden clearly rested on plaintiffs to show cessation of production on all the land within the royalty deed.

Plaintiff's proof centered on cessation of production of the Rowden B–5 well on survey 459 in Webb County. The evidence showed plaintiffs executed an oil and gas lease with W.F. Houser in 1939 on surveys 459 and 659. Rowden had obtained the leasehold interest on 459 and farmed out to Cox; Rowden B–5 produced seven barrels in March, 1972, and none in April; the well had produced for more than 30 years. Production from the well recommenced in October, 1980.

■ "Paying quantities" means that the oil and gas is marketable. *Holchak v. Clark*, 284 S.W.2d 399, 401 (Tex.Civ.App.—San Antonio 1955, writ ref'd). *See Clark v. Holchak*, 152 Tex. 26, 254 S.W.2d 101 (1953). The discovered oil and gas must be sufficient to pay the lessee a profit, though small, over operating and marketing expenses. *Cox v. Miller*, 184 S.W.2d 323, 327 (Tex.Civ.App.—Eastland 1944, writ ref'd). It has been stated that paying quantities

for a royalty interest means *any* production. 2 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW § 334.7 (rev. 1983).

Earlier in September, 1971, Rowden executed a farmout agreement with Cox, which resulted in the Cox 1 well, off the Sentz C survey but on Benavides property. Cox No. 2, on the subject royalty tract, was a dry hole, but Cox continued operations and drilled Cox No. 3 on survey 459, commencing production in June, 1972. The evidence thus demonstrates no mineral production from Sentz C survey 459 was obtained for a period of approximately two months. Plaintiffs argue this was cessation which would void the royalty deed. We do not agree.

■ A cessation of production sufficient to terminate a term royalty interest must be a permanent cessation of production. In *Amoco Production Co. v. Braslau*, 561 S.W.2d 805, 809 (Tex.1978) the Supreme Court quoted with approval this statement in *Midwest Oil Corp. v. Winsauer*, 159 Tex. 560, 323 S.W.2d 944, 946 (Tex.1959):

> Although the royalty deed ... does not expressly provide that the term royalty will not terminate because of temporary interruptions, we hold that such a provision is necessarily implied.

323 S.W.2d at 946.

Cox was the operator drilling all three Cox wells; work on Cox 1 and 2 wells began before production from Rowden B–5 ceased. The record reflects the diligent efforts of the operator to restore production in the zone. We do not perceive *Midwest Oil Co. v. Winsauer* as limiting the cause of temporary cessation to mechanical break-downs at the well site or court litigation, the causes of temporary cessation in that case. Nor does *Stuart v. Pundt*, 338 S.W.2d 167 (Tex.Civ.App.—San Antonio 1960, writ ref'd), limit the circumstances to

which the doctrine of temporary cessation may apply. In the present case, as in *Amoco*, the operator, when Cox 2 failed to produce, promptly moved over and obtained production from the same land in the same sand.

## COX 3

The Cox 1 is located on survey 659. Preserving for himself an overriding royalty, Rowden farmed out his Benavides lease to Cox, involving parts of 459 and 659. Cox 1 is, however, off the Sentz C royalty tract but on Benavides property. Production commenced on January 20, 1972. Productive oil sand was discovered at about 5550 feet. Cox 2, dug on survey 659, on the subject Sentz C royalty tract and in the same "sand," was a dry hole. Cox 3, located on survey 459, also on the royalty tract, began production in June, 1972.[1]

The question is whether the lapse of time from the cessation of production of the Rowden B–5 and the commencement of production of the Cox 3 constitutes a permanent cessation of production. If the doctrine of temporary cessation applies in this case, the term royalty does not terminate. *Amoco, supra* at 809.

We agree that the evidence is sufficient that the period of time between cessation of production of the Rowden B–5 and the commencement of production of the Cox 3 does not constitute a permanent cessation for these reasons: (1) the short time period was about 60 days from cessation to commencement, (2) the Cox 3 produced oil from the sand discovered when the Cox 1 was drilled, unchallenged finding of fact 15, (3) the Cox 1 was on property owned by the Benavides family, although not part of the royalty tract, and (4) the operators (Cox) conducted operations diligently and in good faith. *See Amoco, supra* at 808–809.[2]

1. Defendants received no royalties from the Cox 3 after July, 1979, and never received royalties from the Benavides Gas Unit I nor the Gold King Productions, established subsequent to the stipulated time period.

2. Schematic drawing illustrating location and proximity of wells on surveys 659 and 459.

## MAYFIELD B-1 WELL

On May 10, 1968, Mobil Oil Corporation leased from the Benavides family a 1000 acre tract of land out of the Arispe grant, part of the Sentz C royalty tract. Mobil subsequently assigned to Rowden, among others, the shallow rights to the lease, while keeping the deep rights.

> There is excepted from this assignment and reserved unto MOBIL OIL CORPORATION, ASSIGNOR, herein, its successors and assigns, all right, title, estate and interest in the above oil, gas and mineral lease or covering the land described above, and any modification, renewal or extension thereof, below the depth of 4,200 feet.

Rowden then subassigned to Mayfield. Mayfield applied to drill a wildcat well on this tract December 7, 1971; the drilling commenced January 2, 1972, and it was completed February 10, 1972. The well began production at least by April 16, 1972 and there may have been production sooner. At issue is (1) whether this gas well is on the royalty tract, and (2) if it is so determined, whether production commenced in time to perpetuate the lease (there is a gap between cessation of production in paying quantities from the Rowden B-5 and documentary evidence of commencement of production of the Mayfield B-1 in April, 1972).

■ As to the Mayfield B-1, in point of error two, plaintiffs specifically object to:

### Findings of Fact

22. The Mayfield B-1 well is located on the 1,000 acre tract described in the Royalty Deed.

23. The fenceline running along the northeast line of the Mariano Arispe grant has been in its present location from time immemorial, including the date of execution of the Royalty Deed and has been recognized by interested parties and the community generally as the boundary line of Plaintiff's property.

### Conclusions of Law

12. With respect to the 1,000 acre tract out of the northeast part of the Mariano Arispe Grant, Webb County, Texas, the best evidence of the true location of the original northeast line of said grant is the fence line existing along said line from time immemorial and recognized as the grant line by the parties interested therein and the community in general.

13. Alternatively, if the fence line were not the grant line, the fence line along the northeast line of the Arispe Grant having been recognized as the boundary of Plaintiffs' lands, and Plaintiffs and their predecessors having at all times owned sufficient acreage in the northeast part of the Arispe Grant to fully effectuate the conveyance of 1,000 acres called for by the Royalty Deed, the Royalty Deed conveyed 1,000 acres from within the boundaries of Plaintiffs' lands.

14. The proper measurement of the 1,000 acre tract out of the Arispe Grant called for is from the fence line along the northeast line of the Grant.

15. Disregarding all other production, production from the Mayfield B-1 well on the 1,000 acre tract out of the Arispe Grant maintained Defendants' royalty interests in force and effect from, including and after April, 1972.

There is conflicting testimony by two surveyors as to the location of the Mayfield B-1. Defendant's expert witness, Earl A. Dillon, placed Mayfield B-1 14.3 feet inside the Sentz C tract. Plaintiffs' expert witness, C.V. Howland, Jr., found Mayfield B-1 well to be outside the tract. Both witnesses agreed that the best evidence of the true corner of the survey was a fence corner at the northeast corner of the grant.

However, they disagreed whether the fence line, which would place the Mayfield B–1 within the boundary of the Sentz C tract, should be considered the best evidence of the grant line. Confronting these differing opinions, the trial court accepted the testimony of defendants' expert, Dillon, and rejected that of Howland. The court is the sole judge of the credibility of witnesses and chose to believe Dillon over Howland as to the location of the Mayfield B–1. *Chitsey v. Pat Winston Interior Design, Inc.*, 558 S.W.2d 579, 581 (Tex.Civ.App.—Austin 1977, no writ).

In *Tide Water Oil Co. v. Hale*, 92 S.W.2d 1102, 1106 (Tex.Civ.App.—Texarkana 1936, writ dism'd), the court determined a fence line is the agreed boundary line of the parties and their subsequent vendees, even though a subsequent survey may locate the original boundary line elsewhere. The trial court here could find the fence line running along the northeast line of the Arispe Grant to be the northeast line of the 1,000 acre square conveyed by the plaintiffs' predecessor to the defendants' predecessor. The fence line prevails as the reference point for the 1923 royalty grant when the boundary of the grant as established by the fence differs from the boundary of the grant which might be established by calls or course and distance in a later survey. We find the trial court received evidence sufficient to sustain the finding of fact that Mayfield B–1 was inside the Sentz C royalty tract. *Cavanaugh v. Davis*, 149 Tex. 573, 235 S.W.2d 972, 977 (1951).

Plaintiffs also argue that there was a lapse of time between cessation of production in paying quantities of the Rowden B–5 and the commencement of production from the Mayfield B–1. The record indicates that the Rowden B–5 produced 7 barrels in March, 1972, and the Mayfield B–1 commenced production at least by April 16. Plaintiffs produced no witness to the effect that the statement of production from the Mayfield B–1 was a statement of first production. On the other hand, defendants' witness, William R. Thomas, an oil and gas consultant, testified that there may have

been production prior to April 16 as the record indicates.

The term royalty agreement speaks in terms of production from 'said lands.' Under the circumstances of this case a cessation of production of perhaps two months *involving the same lands* does not constitute permanent cessation of production, even if production is from different wells. *Amoco Production, supra* at 809.

## BENAVIDES GAS UNIT I

▮ In 1962 the Benavides family executed an oil and gas lease, which covered 200 acres, part of which comprised the Sentz C royalty tract and part which did not (but was Benavides property) to Blair & Vreeland, a partnership. In 1965, Blair & Vreeland assigned this lease to Century Gas Corporation. Also in 1965 the Benavides executed an oil and gas lease to Century Gas which again encompassed part of the Sentz C tract and other Benavides land. All three leases contained pooling provisions, as shown:

> Anything in this lease to the contrary notwithstanding, it is hereby agreed and stipulated between Lessee and Lessor that should Lessee pool any part of the land covered by this lease as provided in Paragraph 4 thereof, then *lessee shall be given the right to form units for* gas development. . . .

> Anything herein to the contrary notwithstanding, this lease and the acreage covered by this lease or any portion thereof shall not be pooled or combined with other land, acreage or leases, *unless the said land, acreage or leases with which the same is pooled are the lands, acreage or leases of lessors herein.* (Emphasis ours).

In 1965 Century Gas established the Benavides Gas Unit No. 1 which included land from the 1962 and 1965 leases, both of which contained pooling clauses. The unit was completed in March, 1966, and there was continuous production in paying quantities through August, 1972. As to the Benavides Gas Unit, plaintiffs specifically object to the legal and factual sufficiency

of Conclusions of Law 9, 16, 17, 18, 19, 20 and 21.

### Conclusions of Law

9. Plaintiffs, as owners of the executive rights to execute leases respecting the lands included in the Royalty Deed (with the exception of the tract conveyed by them in 1944) have at all times owed to Defendants as nonparticipating royalty owners a duty of utmost good faith and fair dealing.

16. Although Plaintiffs and their predecessors own and have owned the executive rights to execute oil and gas leases upon the property subject to Defendants' royalty interests without joinder by Defendants, they have and had no authority to pool or unitize lands subject to Defendants' royalty interests or to authorize anyone else to do so.

17. The unauthorized acts of Plaintiffs in purporting to authorize the lessees of the Blair-Vreeland lease and the Century Gas Corporation lease, as well as the unauthorized act of Century Gas Corporation in purporting to unitize Defendants' royalty interests, conferred upon Defendants an election to ratify and accept the benefits of all such acts.

18. Such election remained open to Defendants until such time as Defendants actually learned of the unauthorized acts of Plaintiffs and their lessees and thereafter unless and until Defendants took some action or made some claim inconsistent with ratification.

19. Because Defendants acted to ratify the unitization of their royalty interests under the Benavides Gas Unit I promptly upon learning of it and without having taken any action or made any claim inconsistent with such ratification, such ratification was effective to ratify the unit from and after the date of its creation and designation.

20. Production from any part of lands with which lands subject to Defendants' royalty interests were unitized is considered production from the unitized royalty lands for purposes of maintaining in force and effect defendants' royalty interests.

21. Disregarding all other production, production from the Benavides Gas Unit I maintained Defendants' royalty interests in force and effect throughout 1971 and through and including August, 1972.

It is undisputed that the Benavides Gas Unit I well was not on the Sentz C tract but was part of the pooled unit. Plaintiffs never informed defendants of the existence of this gas unit. It is established in Texas oil and gas law that production from a gas unit will perpetuate royalty interests in tracts included in the unit, even if the well is not located on such tracts. *Spradley v. Finley*, 157 Tex. 260, 302 S.W.2d 409, 411 (1957); *Williamson v. Federal Land Bank of Houston*, 326 S.W.2d 560, 563 (Tex.Civ. App.—Texarkana 1959, writ ref'd n.r.e.).

Plaintiffs argue that defendants are not entitled to any royalties from this gas unit because they failed to ratify it before production began. We find plaintiffs' argument to be contrary to the duty of utmost fair dealing owed by the owner of an executive right (the plaintiffs) to the owner of a nonparticipating mineral interest (the defendants). *Andretta v. West*, 415 S.W.2d 638, 639 (Tex.1967); *Kimsey v. Fore*, 593 S.W.2d 107, 111 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.).

Utmost fair dealing mandated that plaintiffs notify defendants of the execution of leases creating a unitized tract which included their property to allow them to decide whether to ratify or not. Defendants acted promptly by filing a counterclaim upon learning of the Benavides Gas Unit I. The trial court found they are therefore entitled to royalties accruing. *Andretta, supra* at 641–42. We agree. Plaintiffs are estopped from asserting defendants' failure to ratify because plaintiffs failed to inform defendants of the existence of the pooled unit, until plaintiffs themselves filed their declaratory judgment action in 1979. *Id.* We find that the evidence is sufficient to support the fact finding that production of the Benavides Gas Unit I extended throughout the stipulated period and pro-

duction from this unit is therefore sufficient to perpetuate the royalty agreement as to the entire tract.

 Having considered the possible sources of production in paying quantities from the royalty tract, we agree the trial court received sufficient evidence of no cessation of production during the stipulated period and, therefore, the royalty interest is preserved. Production continued from the Mayfield B–1, the Benavides Gas Unit I well and the Cox 3 during the stipulated period. Accordingly, we overrule points of error one through three.

In point of error four, plaintiffs contend when they and defendants executed division orders involving wells located on survey 459 on February 9, 1973, with lessee Edwin L. Cox, they did not perpetuate the royalty interests of defendants. Relevant parts of these division orders read:

> FIFTH: The undersigned hereby expressly ratify and confirm the division of interest as herein set forth, as well as the oil, gas and mineral lease or leases, pursuant to which oil and gas from the property is being produced.

> SEVENTH: This division order shall become valid and binding on each and every owner above named as soon as signed by such owner...

Additionally, defendants were paid royalties under these division orders until plaintiffs filed suit in July, 1979. Plaintiffs object to the legal and factual sufficiency of:

### Findings of Fact

26. Plaintiff, Arturo Benavides, personally observed the cessation of production from the Rowden B–5 well and all facts and occurrences relating to Plaintiffs' claim herein were known or readily available to Plaintiffs at all times and after April, 1972.

27. On February 9, 1973, Plaintiffs executed and delivered to Edwin L. Cox written, witnessed, Oil and Gas Division Orders expressly ratifying and confirming Defendant's royalty interests in Survey 459.

### Conclusion of Law

24. Even if Defendants' royalty interests had terminated in 1971 or 1972, the acts of Plaintiffs in executing division orders in February of 1973 expressly ratifying and confirming Defendants' royalty interests under the Royalty Deed operated as a ratification and revivor of such interests.

A division order is an authorization to a person who has or will have a fund for distribution among persons entitled thereto as to the manner of distribution. 4 H. WILLIAMS, *supra* at § 701. Division orders are binding on the parties until revoked. *Exxon Corp. v. Middleton,* 613 S.W.2d 240, 251 (Tex.1981). In this case, plaintiffs revoked division orders when defendants were served with plaintiff's petition in 1979. *Id.* at 251. Until withdrawn in 1979, these division orders defined the basis for payment and payments made in accordance with them were final and binding. *Phillips Petroleum Co. v. Williams,* 158 F.2d 723, 727 (5th Cir.1947). At best, then, plaintiffs may contest whether defendants are entitled to payment under these division orders subsequent to 1979, but may not challenge payment from 1972–1979. Since we agree with the trial court that the royalty interest was preserved by continuing production on the royalty tract, we need not consider whether the division orders *alone* ratified defendants' royalty interest.

 In point of error five, plaintiffs contend the trial court erred in finding them guilty of laches, and challenge the legal and factual sufficiency of the evidence supporting these findings of fact:

### Findings of Fact

26. Plaintiff, Arturo Benavides, personally observed the cessation of production from the Rowden B–5 well and all facts and occurrences relating to Plaintiffs' claim herein were known or readily available to Plaintiffs at all times from and after April, 1972.

39. Plaintiffs delayed an unreasonable length of time between April of 1972 and the institution of this suit in July, 1979.

40. Defendants were prejudiced by Plaintiffs' delay in bringing this action for reasons including the fact that evidence became obscure and impossible to obtain pertaining to factual issues herein which would have been available had suit been filed without unreasonable delay.

42. Prior to November, 1978, Plaintiffs, personally and through their attorneys, and without notice to Defendants, represented to GoldKing Production Company, the owner of the oil and gas leasehold estate, or working interest, under the Ponder lease, that Defendants' royalty interests under the Royalty Deed had terminated and that Defendants owned no interests in production from Survey 669.[3]

### Conclusion of Law

25. Plaintiffs were guilty of laches in the institution of this suit and their suit is accordingly barred.

Laches is an affirmative defense and the defendants therefore had the burden of proof. TEX.R.CIV.P. 94. Laches consists of two elements: (1) unreasonable delay by one having legal or equitable rights in asserting them, and (2) good faith change of position by another to his detriment because of the delay. *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex.1964). If the delay is such that the defendant's ability to defend against the claim or to ascertain the true facts is impaired, then plaintiff's claim should be barred. *Pearson v. American Fidelity & Casualty Co.*, 321 S.W.2d 620, 622 (Tex.Civ.App.—Amarillo 1959, writ ref'd n.r.e.); *Brady v. Garrett*, 66 S.W.2d 502, 504–05 (Tex.Civ.App.—El Paso 1933, writ dism'd) (on motion for rehearing).

■ It is undisputed plaintiffs failed to assert their claim that defendant's royalty interest had terminated until seven years after the purported cessation of production.

Thomas, the oil and gas operator, testified that had the suit been filed soon after the purported cessation, it would have been easier to discover the scope of production as well as operating costs. This testimony is uncontroverted. The seven year delay in filing suit made it more difficult to retrieve the evidence. *Brady v. Garrett, supra* at 504–05. We find that the evidence is sufficient to support the findings of the trial court in determining the plaintiffs to be guilty of laches, and we note that this alone suffices to bar the suit. The point is overruled.

### REVIEW OF CONCLUSIONS OF LAW

■ Plaintiffs attack many of the trial court's conclusions of law on legal and factual sufficiency assignments of error (points of error one through five). The principal usefulness of conclusions of law is to denote to the appellate court the theory on which the action was tried. If the controlling finding of facts will support a correct legal theory, incorrect legal conclusions will not require a reversal. *City of Corpus Christi v. Davis*, 575 S.W.2d 46, 55 (Tex.Civ.App.—Corpus Christi 1978, no writ); 4 McDONALD, *supra* at § 16.05 (1971).

■ A proper judgment will not be reversed merely because it is based on a wrong conclusion of law. *Houston Natural Gas Corp. supra* at 908, citing *Andrews v. Key*, 77 Tex. 35, 13 S.W. 640, 642 (1890):

> Appellant's remaining assignments of error complain of the court's conclusion of law. We need not consider them in detail, because it is immaterial whether the propositions of law announced by the court as the grounds of its judgment be correct or not, provided a proper judgment has been rendered.

13 S.W. at 642. Although TEX.R.CIV.P. 300 and 301 mandate that a judgment must conform to the findings of facts, no rule requires the judgment to conform to the

---

**3.** We do not find this Finding of Fact relevant to whether plaintiffs were guilty of laches or not. However, it is significant in the final calculation of royalties due defendants.

conclusions of law. An otherwise correct judgment will not be set aside because the trial court made one or more incorrect conclusions of law. *Wirth, Ltd. v. Panhandle Pipe & Steel, Inc.,* 580 S.W.2d 58, 62 (Tex. Civ.App.—Tyler 1979, no writ). Where the findings of fact are sufficient to support the judgment and are not against the great weight and preponderance of the evidence the judgment will be upheld even though the trial judge erred in some conclusions of law. *Id.* (citations omitted) It is the duty of the appellate court in that instance to uphold the judgment on any theory applicable to the case, even though some or all of the conclusions of law are found to be erroneous. *Id.* at 63 (citations omitted).

Having examined the twenty-nine conclusions of law and determined that some of them may be termed findings of fact (as the trial court surmised), we find they correctly reflect the evidence presented. Any that may properly be called findings of fact blend with the other findings and are supported by the evidence which is both legally and factually sufficient. We accordingly hold the findings of fact support the judgment in this case.

In points of error six and seven, plaintiffs object to the trial court's granting royalty payments and prejudgment interest on defendants' counterclaim. Since we agree that the royalty interest has been preserved, we hold that defendants are clearly entitled to royalty payments and prejudgment interest thereon. Points of error six and seven are overruled. The judgment is affirmed.