E.E. COBB, et al., Plaintiffs–Appellees,

v.

NATURAL GAS PIPELINE COMPANY OF AMERICA and Chevron USA, Inc., Defendants–Appellants.

No. 88–1789.

United States Court of Appeals, Fifth Circuit.

March 27, 1990.

Rehearing Denied April 26, 1990.

John L. Verner, Shawn K. McKean, Calvin, Dylewski, Gibbs, Maddox, Russell & Verner, Houston, Tex., for Natural Gas Pipeline Co.

Harlow Sprouse, James W. Wester, Underwood, Wilson, Berry, Stein & Johnson, Amarillo, Tex., for Chevron USA.

J.R. Lovell, Lovell & Lyle, Dumas, Tex., for plaintiffs-appellees.

Before BROWN, WILLIAMS and JOLLY, Circuit Judges.

**JOHN R. BROWN, Circuit Judge:**

Plaintiff-lessors brought suit for declaratory judgment and conversion damages against defendant-lessees, arguing that because production had ceased from plaintiff-lessors' natural gas well, defendant-lessees' oil and gas lease was automatically terminated. Defendants denied termination, and offered three affirmative defenses—laches, ratification, and adverse possession. The District Court in a non-jury trial held that the lease had terminated, and rejected all three affirmative defenses. On appeal, we reverse the District Court's holding that the lease had terminated. Accordingly, we reverse with directions to enter judgment for the defendant-appellant. Since we hold for the defendant-appellant on the main claim, we do not reach the District Court's rulings on the three affirmative defenses, laches, ratification, and adverse possession.

## Proceedings

This case was initiated in 1986 by E.E. Cobb, Effie C. Robinson and Lillie C. Brewton, (Plaintiffs), by the filing of their Original Petition. Appellant Natural Gas Pipeline Company of America (Natural), together with the other named defendant, Gulf Oil Corp., now Chevron, USA, Inc. (Chevron), removed the suit to the United States District Court. Plaintiffs sought relief against Natural in two respects. First, they sought a declaratory judgment that a particular oil and gas lease, (the W.E. Cobb G–1 lease), had terminated due to periods of non-production in 1947, 1962 and 1974. Plaintiffs also sought damages for Natural's alleged conversion of gas following termination of the lease. After full discovery and extensive briefing by the parties, trial was held before the Court on January 14, 1988.

After further briefing by the parties, the District Court issued its opinion on May 13, 1988. The Court held that the W.E. Cobb G–1 lease terminated in 1974 for lack of production and awarded conversion damages. Natural filed its Motion for New Trial and Amendment of Findings which was overruled. Natural timely filed its Notice of Appeal, seeking review of the District Court's decision on the lease cancellation and affirmative defenses raised by Natural.[1]

Natural is an interstate natural gas company which produces and purchases gas in several states, including Texas, for transportation and ultimate re-sale primarily in the vicinity of Chicago, Illinois. One of Natural's sources of gas is a field underlying property owned by Plaintiffs in the Texas Panhandle region.[2]

About June 18, 1917, Plaintiff's predecessor-in-interest, W.E. Cobb, lessor, executed an oil and gas lease covering the subject property in favor of Empire Gas & Fuel Co., lessee. The lease set forth a primary term of ten years and "so long [thereafter] as oil or gas is found in paying quantities." Through a series of conveyances, the lease and all rights appurtenant thereto were assigned to Gulf Production Company. About April 2, 1928, the W.E. Cobb G–1 well was drilled on the subject property and was completed as a gas well about May 28, 1928. About July 12, 1933, Gulf Production Company assigned its gas rights to Texoma Natural Gas Company, the predecessor-in-interest to Natural.

As found by the District Court, gas production from the W.E. Cobb G–1 flowed continuously from the date of initial production to the time of trial except for the following periods: (i) from December 1946 through August of 1947; (ii) from July through September of 1962; and (iii) from May 1974 through January of 1975. Plaintiffs contend that such periods of non-production amount to a permanent cessation of production, thereby causing the lease to terminate by its own terms. Natural asserts that the cessations of production have not been permanent, but only temporary and under applicable Texas law do not operate to terminate the lease.

1. Chevron's interest in this case derives from Natural's and Chevron therefore joins with and relies upon Natural's arguments and position.

2. Specifically, the Northeast Quarter of Section 202, Block 3, I & GN Survey, Carson County, Texas (the "subject property").

*Standard of Review*

Rule 52(a) F.R.Civ.P. provides that the findings of fact made by the court shall not be set aside unless clearly erroneous. The burden of showing that the findings of fact are clearly erroneous is on the party attacking them. *Baggett v. Richardson*, 473 F.2d 863, 865 (5th Cir.1973). As the Supreme Court explained in *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985), a finding of fact may be set aside as clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. However, if the District Court's account of the evidence is plausible in light of the record reviewed in its entirety, the reviewing court may not reverse it. *Id.* 470 U.S. at 573–74, 105 S.Ct. at 1511. Of course, the District Court's Conclusions of Law are subject to full appellate review even though determinations of state law are involved. *See Freeman v. Continental Gin Co.*, 381 F.2d 459, 466 (5th Cir.1967).

## DID THE W.E. COBB G–1 LEASE TERMINATE?

The rule in Texas is that upon permanent cessation of production after the primary term, a mineral lease automatically terminates. *Amoco Production Co. v. Braslau*, 561 S.W.2d 805, 808 (Tex.1978). However, a lease—oil or gas or both—which has been extended beyond the primary term by the production of oil or gas will not automatically terminate by reason of a temporary cessation of production. *Id.* 809–10; *Midwest Oil Corp. v. Winsauer*, 159 Tex. 560, 323 S.W.2d 944, 946 (1959). In most instances, the lease itself will set forth what constitutes a temporary cessation of production and will give the lessee a certain amount of time from the date production ceases in which to commence operations and restore production. *See, e.g., Woodson Oil Co. v. Pruett*, 281 S.W.2d 159, 164 (Tex.Civ.App.—San Anto-

nio 1955, writ ref'd n.r.e.). The lease involved in the present case, however, is silent as to the lessee's obligations to continuously maintain production or to restore production once production ceases. In such a situation, Texas courts have repeatedly found that a "temporary cessation" clause is "necessarily implied" in the lease. *Midwest Oil Corp. v. Winsauer*, 159 Tex. 560, 323 S.W.2d 944, 946 (1959).

To prevent the termination of the lease under an implied temporary cessation clause, (i) the cessation of production in the words of the courts must be "due to a sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like," and (ii) the lessee must remedy the problem and resume production within a "reasonable time." *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784 (1941). What constitutes a reasonable time will of course depend on the particular facts presented. For instance, it has been held that a twenty-one month cessation was temporary where the lessee was engaged in efforts to rehabilitate the only producing well on the premises. *Beatty v. Baxter*, 208 Okl. 686, 258 P.2d 626, 628 (1953), *cited with approval* by the Texas Supreme Court in *Midwest Oil Corp. v. Winsauer, supra* 323 S.W.2d at 947. In *Winsauer*, the Texas Supreme Court held that, as a matter of law, a cessation of production for 174 days was temporary where there was mechanical breakdowns and litigation between the lessor and lessee. *Winsauer, supra*, at 946, 948.

Plaintiffs based their lawsuit upon three cessations of production from the subject well: (i) a nine month period in 1946–47, (ii) a three month period in 1962, and (iii) a nine month period in 1974–75.[3] It is undisputed that production resumed after each of these periods. Natural had the burden of proof to establish that the reason for the cessation of production was the equivalent of a sudden stoppage of the well or some mechanical breakdown or "the

---

3. Although there were other shorter instances of non-production at different times, Plaintiffs sought cancellation only for cessations in excess of sixty days, and findings were neither requested nor made with respect to shorter periods.

like." *Bradley v. Avery,* 746 S.W.2d 341, 343 (Tex.App.—Austin 1988, no writ).

At trial, Natural relied on the testimony of Norris Pedigo, a Manager of Reservoir Engineering possessing Texas accreditation as a registered professional engineer in the field of petroleum and natural gas engineering. Mr. Pedigo sponsored exhibits which depicted Natural's interstate pipeline system in Carson County, and the subject well with its connection to Natural's pipeline system. He explained that the subject well is connected to a short pipeline known as Lateral 7, and that there are two other wells connected to the same lateral: The N.A. Cobb T–1 and the J.C. McConnell T–1–B.[4] Historical production data was introduced to demonstrate a general correlation between production trends among the three Lateral 7 wells. Based upon correlations between periods of cessation and resumption of production between the Lateral 7 wells, expert Pedigo expressed the conclusion that pipeline pressure problems in Lateral 7 have at times affected the ability of the Lateral 7 wells to flow into Natural's system, hence the interruption (or reduction) of production.

Pedigo also gave the District Court a general explanation of the necessity of having a lower level of pressure in a pipeline than that found in a well in order for gas from the well to be able physically to flow into the pipeline. He added that the addition of a compressor to a pipeline can lower line pressure upstream of the compressor, thus enabling gas from lower pressure wells to be able to flow. The upstream gas is then pressured up by the compressor and discharged into the higher pressure zone existing downstream of the compressor.

Pedigo testified as to the history of the installation of compression on Lateral 7 and on the pipeline into which Lateral 7 flows. Booster 42 was added to compress gas and enhance production from wells flowing into the Carson–Gray County Line from the east. As it lowered line pressures to the east, Booster 42 had the side effect of gradually raising line pressures to the west, where inflow from Lateral 7 occurs. Pedigo testified that such rising pressures west of Booster 42 eventually choked off production from the Lateral 7 wells. Booster 42 began operating in October of 1946, and production from the W.E. Cobb G–1 ceased in December 1946. This was the beginning of the first nine-month cessation complained of by Plaintiffs.

In order for the Lateral 7 wells to overcome the differential between their own pressure and the higher pipeline pressure into which they had to flow, Pedigo explained that it was necessary for Natural now to add compression for the direct benefit of Lateral 7. This project was completed by September of 1947 when Booster 46 was installed at the junction of Lateral 7 and the Carson–Gray County Line (See Def.Ex. # 8). As with all compressors, line pressures upstream of Booster 46 were lowered, and this allowed the Lateral 7 wells to flow again. Lateral 7 gas was then pressured up and pushed into the higher pipeline pressure existing downstream of Booster 46. The results of the addition of Booster 46 were, according to Pedigo, "extremely dramatic ..." The W.E. Cobb G–1 produced more gas in three months in 1947 than it has ever produced in an entire year, before or since. Pedigo concluded that the only reason the subject well did not produce for nine months was due to excessive line pressure in Lateral 7, and the remedy was the addition of compression.

*Line Pressure Problems in 1974*

Natural asserts that line pressure problems which caused a cessation of production in 1947 recurred in 1974 when increasing demands upon Booster 46 rendered it unable to continue to push Lateral 7 gas into the Carson–Gray County Line. As explained by Pedigo, a number of significant changes had occurred in Natural's gathering system. In the late 1940s, Booster 42 to the east of Lateral 7 had

---

**4.** Applying the Oriental wisdom, understanding the facts of this case is enhanced by a visual portrait of the relevant pipelines and booster stations. Accordingly, we include excerpts from D.Exs. Nos. 8 and 12 in the text.

been disposed of, and westward flowing gas was routed through Booster 46 for compression along with Lateral 7 gas.

By 1960, Natural had added a new source of gas flowing northward into the Carson–Gray County Line through new Lateral 138. By 1964, Lateral 138 gas was in need of compression, so it was routed through Booster 46. Whereas it originally compressed only Lateral 7 gas, Booster 46 now handled gas from three laterals. Pedigo testified that as gas pressures in the laterals feeding Booster 46 declined, the compression available at Booster 46 was no longer sufficient to move all the gas necessary, so the subject well stopped flowing in 1974.

As in 1947, the remedy for declining production was the addition of compression. Natural's approach to the restoration of compression was twofold. First, it increased the capacity of Booster 46 by adding a new engine. It also lightened the burden on Booster 46 by providing Lateral 138 with its own separate compression (Booster 48), and divorced the flow of Lateral 138 gas away from Booster 46 and directly into the Carson–Gray County Line. The additional capacity and lightened load upon Booster 46 allowed it once again to push Lateral 7 gas into the Carson–Gray County Line.

Production from the subject well recommenced in February of 1975, and its production for that year was the second highest total in eighteen previous years. Pedigo concluded without equivocation that line pressure had been the problem causing the cessation of production and that added compression was the solution:

**Q:** So you see a correlation between the addition of Booster 48, the additional capacity of Booster 46 and the resumption of flow in 1975 from Lateral Number 7, is that correct?

**A.** Absolutely.

(Tr. 62:16–20).

**Q:** So you think a line pressure problem was the reason that the Cobb well did not flow in 1974?

**A.** In my mind I am convinced of it. I can't find any other reason, and this is a very reasonable thing. I am just totally convinced of it myself that that is the reason—only reason that the wells would not produce at that time.

(Tr. 64:15–20).

Pedigo undertook to bolster his conclusion with additional data which was not available for the two earlier periods of non-production. He was able to find actual pressure readings from the inlet point at which Lateral 7 gas flows into Booster 46, and was able to correlate a decline in such pressures with the addition of compression. The result of lowered pressure in Lateral 7 was the resumption of flow from the subject well.

Correlations in production between the Lateral 7 wells also led to Pedigo's opinion that line pressure caused the three month cessation in 1962 of which Plaintiffs complained. Specific correlations with the addition of compression were not determined for this period, although production did resume. Natural urged that Pedigo's investigation into the 1960s was hampered by the passage of time.[5]

*Did the District Court Err in Rejecting Natural's Explanation for Cessation?*

■ Plaintiffs have assailed Pedigo's explanation as speculation, and the District Court rejected it as a "process of elimination." However, Plaintiffs offered no evidence to support their claims that the cessations of production from the W.E. Cobb G–1 well were permanent nor did they offer any alternative theories to explain either one or all of the admitted cessations. Nor does the record reveal any other cause. Moreover, Plaintiffs offered no evidence to rebut Pedigo's testimony and opinions as to the reasons for non-production. During direct examination, Pedigo was asked about

5. We should emphasize that while the District Court made factual findings that the well did not produce for periods in 1947 and 1962, it made no conclusions of law respecting termination for those earlier two periods. The District Court simply found that the lease terminated in 1974, without reaching the issue of legal termination for 1947 and 1962.

alternative explanations for the termination of production, and he confidently testified that the only possible reason for the cessation of production was line pressure problems.[6]

While Natural had the burden of proof to establish the reasons for non-production, *Bradley*, at 343, Pedigo provided a reasonable and uncontroverted explanation for the non-production, and established that the well again commenced production following each period of non-production. Moreover, there was no substantial evidence of any other cause. Accordingly, we find that the District Court was clearly erroneous in rejecting Natural's explanation for the cessation of production.

Finally, Plaintiffs assert that Natural has not met its burden of proof with respect to the second prong of the temporary cessation doctrine, i.e., it did not show that it remedied the problem and resumed production within a reasonable time.[7] Plaintiffs emphasize that although Pedigo admitted that production ceased in May, 1974, he stated that the workover on the well did not begin until July, 1974. Despite this approximately two month delay between the cessation of production and the initiation of work on the well, we find that Natural resumed production within a reasonable time. The District Court did not make any findings or conclusions against Natural on this issue, and the record contains no evidence to support any contrary finding or conclusion. Plaintiffs did not challenge Pedigo's testimony concerning Natural's diligence, nor did they offer any evidence to show that Natural did not act diligently.

Consequently, we reverse the judgment and direct the issuance of a judgment in favor of Natural.

REVERSED WITH DIRECTIONS.

---

6. The question asked by Natural's attorney and Pedigo's response were as follows:

   **Q:** Is there any reason in your mind other than line pressure problems why there was not production flowing from the subject Cobb well during 1974?

   **A:** There is no question in my mind that that is the only reason there is, that it didn't flow. As I said earlier, we looked into allowables. There was no problem there. The workover of the well indicated that it wasn't filled up with mud or water or whatever, so any lateral work that needed to be done, you know, they didn't like reinstall a lateral or anything, the lateral had to be shut out, repaired or something, you know, it certainly wasn't taking that long to do it. So in my mind that is the only reason, because the line pressure is too high and that problem was solved when Booster 48 was put into service and the Lateral 138 gas was divorced from Booster 46. (Tr. 69:8–21)

7. The temporary cessation doctrine, as described above, provides that to prevent the termination of a lease under an implied temporary cessation clause, (i) the cessation of production must be "due to a sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like," and (ii) the lessee must remedy the problem and resume production within a "reasonable time." *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784.