Carolyn FREEMAN, Maurice Epley
and Ann Freeman, Appellants,

v.

SAMEDAN OIL CORPORATION
and Sklar & Phillips Oil
Company, Appellees.

No. 12–99–00334–CV.

Court of Appeals of Texas,
Tyler.

April 18, 2001.

Rehearing Overruled Aug. 1, 2001.

Levon G. Hovnatanian, Feldman & Rogers, LLP., Houston, for appellants.

Lawrence F. Labanowski, Houston, David M. Gunn, Bellaire, for appellees.

Panel consisted of DAVIS, C.J., WORTHEN, J., and GRIFFITH, J.

DAVIS, Justice.

In this oil and gas lease termination case, Appellants, Carolyn Freeman, Maurice Epley, and Ann Freeman (collectively the "Freeman sisters" or "Appellants") are lessors under the subject oil and gas lease, and Appellees, Samedan Oil Corporation ("Samedan") and its predecessor in title, Sklar & Phillips Oil Corporation ("Sklar"), are lessees. On cross motions for partial summary judgment, the trial court granted Appellees' motion and denied Appellants', entering a final declaratory judgment that the oil and gas lease had not terminated and awarding damages. We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

## BACKGROUND

### The Freeman Lease

The oil and gas lease in question ("the Freeman Lease") was executed effective June 28, 1966, between the Freeman sisters,[1] as lessors, and George E. Jenkins, as lessee. The Freeman Lease purported to cover approximately twenty-five acres of land in Cass County, Texas, in which the Freeman sisters owned an undivided one-tenth (1/10th) interest. Jenkins was acting on behalf of Sklar and subsequently assigned the Freeman Lease to Sklar. Sklar pooled 19.83 acres of the Freeman Lease ("The Freeman Tract") with other tracts it had leased to form an 88 acre oil unit ("the Price Oil Unit").

### The Price Oil Unit

Sklar drilled a well within the Price Oil Unit and on July 15, 1966, completed an oil well ("the Price Oil Well"),[2] although the

---

1. Carolyn Freeman, Maurice Epley, and Ann Freeman are sisters.

2. The Price Oil Well has also been referred to as the "Hill Zone Unit Well No. 1–H," the "Sklar–Lillie J. Price Well," the "Sklar Well,"

drill site was not on the Freeman Lease acreage. Nevertheless, the Freeman sisters were entitled to their share of production because 19.83 acres of their lease acreage had been included in the 88 acre Price Oil Unit. Less than a year later, Sklar sought to initiate a secondary recovery waterflood project involving several thousand acres in the area, including the Freeman Lease acreage.

## The Waterflood Units

In early 1967, Sklar sought to create two secondary recovery waterflood units,[3] the Hill Zone Unit containing 1,414 acres, and the Mitchell Zone Unit containing 1,529 acres (collectively "the Waterflood Units"). Sklar asked all of the leasehold (working interest and royalty interest) owners with acreage in the proposed waterflood units to join the waterflood project by signing a Waterflood Unit Agreement setting forth how the Waterflood Units would be operated and how each of the interest owners would share in the production.

Sklar was successful in getting 99.98% of the working interest owners and 99.65% of the royalty interest owners to sign a Waterflood Unit Agreement. The Freeman sisters refused to sign, despite repeated requests by Sklar. Sklar also asked the Freeman sisters to sign an amendment to the Freeman Lease giving Sklar the express right to pool the Freeman Lease "into one or more field-wide production units for the purpose of initiating, maintaining and operating one or more secondary recovery ... programs for the recovery of oil, gas and other minerals from said unit or units...." The Freeman sisters refused to sign the lease amendment. It is undisputed that the Freeman sisters never

signed the Waterflood Unit Agreement or amended their original oil and gas lease agreeing to participate in a waterflood project. Nevertheless, Sklar sought approval from the Texas Railroad Commission to proceed with the waterflood project.

On July 12, 1967, a hearing was held at the Railroad Commission on Sklar's application for approval of the two Waterflood Unit Agreements and for permission to conduct water injection operations in the two affected reservoirs. On July 21, 1967, another hearing was held seeking authorization to use the Price Oil Well as the primary water injection well for the project. The Freeman sisters had notice of both hearings, but did not appear or participate at either. The Railroad Commission approved both unit agreements, but expressly stated the following in both orders:

4. That such agreement **does not bind any person who does not execute same, but binds only the persons who execute it,** their heirs, successors, assigns and legal representatives.

5. [T]hat the owners of interests not desiring to enter such unit on the yardstick basis provided may refuse to join in the unitized operations and **continue to participate in the production from the field on an independent basis governed by the Commission rules and regulations for said field, and by the provisions of the individual lease contract.**

6. That the rights of all owners of all interests in the field, **whether signers of the unit agreement or not, will be protected under its operation;** ...

---

the "Price Well," and by its lease number 049993.

**3.** Waterflooding is a "method of secondary recovery in which water is injected into an oil reservoir for the purpose of washing the oil

out of the reservoir rock and into the bore of a producing well." Williams and Meyers, *Manual of Oil and Gas Terms* 1167 (10th ed.1997).

that the rights and interests of non-signers are not included, involved or interfered with by the action of this agreement so they may continue to own and operate their properties, at their own election, **as though said unit agreement had never been established.** (Emphasis added).

The Railroad Commission authorized the use of the reservoirs within the waterflood units for water injection, and approved the use of the Price Oil Well as the injection well. (*See* Railroad Commission Special Order Numbers 6–57,637, 6–57,638, and 6–57,717).

On September 1, 1967, Sklar ceased production of oil from the Price Oil Well, converting it into a water injection well for its secondary recovery project. The waterflood units continued to produce from wells outside the Price Oil Unit, but never again produced any oil from the Price Oil Well or any other well in the Price Oil Unit. The waterflood project was abandoned in 1990. From September 1, 1967 until 1990, the Price Oil Well was used solely for water injection and no oil or gas was produced from it.

### The Price Gas Unit

In 1986, Sklar assigned the 25 acre Freeman Lease to TXP Operating Company ("TXP"). TXP joined with several other parties to form a 674.25 acre gas unit which included the Freeman Tract, and subsequently drilled and completed a gas well ("the Price Gas Well")[4] on the Freeman tract. Thus, the Price Gas Well was drilled after the Price Oil Well had been converted to a water injection well in 1967, but before the waterflood units were abandoned in 1990. On January 1, 1989, TXP assigned the Price Gas Well to Samedan Oil Corporation ("Samedan"). The Price Gas Well has continued to produce gas from the date of first sale, February 21, 1991, until the time of trial.[5]

### The Lawsuit

In May of 1998, the Freeman sisters filed this lawsuit and subsequently amended to seek a declaratory judgment that the Freeman Lease terminated in 1967 due to cessation of production. They contended that sixty days after the Price Oil Well was converted to a water injection well on September 1, 1967, the Freeman Lease terminated due to cessation of production. Sklar and Samedan answered, contending that the Freeman Lease did not terminate because it was held by production from the waterflood units in which it had been involuntarily pooled pursuant to pooling provisions of the Freeman Lease. The Freeman sisters also sought an accounting as a co-tenant in the Price Gas Well, claiming a proportionate share of the production from their land, as opposed to royalty. They also alleged fraud and sought attorneys fees. Sklar and Samedan asserted affirmative defenses of laches, estoppel, and waiver.

All parties filed cross motions for partial summary judgement on the legal issue of whether or not the Freeman lease terminated in 1967 when the Price Oil Well was converted to a water injection well. The trial court granted Appellees' motion for partial summary judgment declaring that "the Lease has been maintained in full force and effect by production from the end of its term to the present; and that

---

4. The Price Gas Well has also been referred to as the "Lillie J. Price No. 1 Well, API Number 42–067–30545," the "TXP–Lillie J. Price No. 1 Well," the "Lillie J. Price No. 1 gas well," the "Lillie Price Well," the "Lillie J. Price Well," and the "TXP Gas Well."

5. It is undisputed that delay rentals were properly paid on the Price Gas Well from date of drilling to the date of first production.

the Lease is a currently valid and subsisting lease." Conditioned upon this finding, the parties stipulated to the royalties due to each plaintiff ($1,545.75) and the trial court entered a final judgment from which this appeal follows.

### THE STANDARD OF REVIEW

Since this is an appeal from a Rule 166a(c) motion for summary judgment, this Court must apply the standards established in *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985), which are:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.
2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.
3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

■ For a party to prevail on a motion for summary judgment, he must conclusively establish the absence of any genuine question of material fact and that he is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c). A movant must either negate at least one essential element of the non-movant's cause of action, or prove all essential elements of an affirmative defense. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex.1986). Since the burden of proof is on the movant, and all doubts about the existence of a genuine issue of a material fact are resolved against the movant, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *Great Am. Reserve Ins.*

*Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965). We are not required to ascertain the credibility of affiants or to determine the weight of evidence in the affidavits, depositions, exhibits and other summary judgment proof. The only question is whether or not an issue of material fact is presented. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929 (1952).

■ Once the movant has established a right to summary judgment, the non-movant has the burden to respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex.1979). All theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. *Casso v. Brand*, 776 S.W.2d 551, 553 (Tex.1989).

■ When both parties have moved for summary judgment, and the trial court grants one and denies the other, the appellate court may reverse the trial court's judgment and render such judgment as the trial court should have rendered, including rendering judgment for the movant who did not prevail in the trial court. *Jones v. Strauss*, 745 S.W.2d 898 (Tex. 1988); *Ackermann v. Vordenbaum*, 403 S.W.2d 362 (Tex.1966); *Tobin v. Garcia*, 159 Tex. 58, 316 S.W.2d 396 (Tex.1958). However, this is not always the case when both parties have moved only for partial summary judgment. *United Parcel Service, Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 917 (Tex.App.—Houston [14th Dist.] 2000, pet. filed); *Members Ins. Co. v. Branscum*, 803 S.W.2d 462, 465 (Tex.App.—Dallas 1991, no writ).

### The Issues

The threshold legal issue in this case is whether or not the Freeman Lease termi-

nated in 1967 when the Price Oil Well was converted from a producing oil well to a water injection well (Issues Number 1–4). If the lease did not terminate, then there are no other issues for this Court to consider, as the parties stipulated to the other issues in the court below. But if the lease did terminate, then this Court must consider the affirmative defense issues (Issues Number 5–11, 14, and 15), and the joinder of parties issue (Issue Number 16). Appellees have withdrawn their challenge to the timeliness of an amended motion filed by Appellants (Issue Number 12). We address the lease termination issue first.

### LEASE TERMINATION

■ In their first four issues, Appellants argue that the Freeman Lease terminated by its own terms due to cessation of production in 1967, when the Price Oil Well was converted to a water injection well. Appellees argue that even though the Price Oil Well ceased to produce oil from its well bore, the Freeman Lease was, nevertheless, held by production from other wells within the waterflood units into which the Freeman Lease had been unitized. Appellees argue that, even though the Freeman sisters never executed the Waterflood Unit Agreement or signed the "secondary recovery" lease amendment tendered by Sklar, they had consented in advance to allow their acreage to be pooled into such a waterflood unit by virtue of the pooling provisions of section 17 of the Freeman Lease. The determinative question is whether or not section 17 of the Freeman Lease allows the lessee to unitize the lessors' acreage into a field-wide secondary recovery waterflood unit without the consent of the lessors. To answer this question, we must first examine the Freeman Lease.

The Freeman Lease grants the lessee the right to produce oil for a primary term of one year and "as long thereafter as oil . . . is produced from said land by Lessee or any of the obligations or conditions hereinafter specified in lieu of production are fulfilled." Section 17 of the Freeman Lease provides in pertinent part as follows:

17. **Lessee is hereby given the power and right . . . at its option and without Lessor's joinder or further consent, to . . . pool and unitize the leasehold estate . . . so as to create by such pooling and unitization one or more drilling or production units. . . . Each drilling or production unit shall not exceed 40 acres,** plus an acreage tolerance not to exceed ten per cent (10%) of 40 acres, when created **for the purpose of drilling for or producing oil** therefrom **and 640 acres,** plus an acreage tolerance not to exceed ten per cent (10%) of 640 acres, when created **for the purpose of drilling for or producing gas** . . . provided, however, if the maximum drilling or production unit fixed or allowed by the Texas Railroad Commission . . . as the basis for the development and operation of or the production from the field in which the above described land is located, be more or less than said maximum, then, in either such event, each such unit created hereunder shall not exceed the maximum so prescribed or permitted and in force in the field at the time such unit is created plus an acreage tolerance not to exceed ten percent (10%) of such maximum. . . . As to such unit so created by Lessee, there shall be allocated to the acreage covered by this lease, and included in the pooled unit, such **portion of the production . . . from said unit as the number of acres out of this lease placed in any such unit . . . bears to the total number of acres included in such unit,** and Lessor agrees to accept and shall receive the royalties (shut-in or other

kind) elsewhere specified in this lease, based upon the production so allocated to this lease or the proceeds therefrom. ... The development of and production from each such unit shall be in accordance with the valid orders, rules and regulations of the Texas Railroad Commission. ...

Appellants argue that section 17 only allows involuntary unitization of the Freeman Lease into "drilling or production units," and a "secondary recovery waterflood unit" is not a "drilling or production unit." Appellees argue that "the ordinary pooling clause found in an oil and gas lease includes pooling or unitization for waterflooding."

▮▮▮▮ In constructing an oil and gas lease, its language is generally regarded as that of the lessee. *Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 815 (Tex.1972), citing *Zeppa v. Houston Oil Co.*, 113 S.W.2d 612, 615 (Tex.Civ.App.—Texarkana 1938, writ ref'd). If that language has two or more equally reasonable constructions, the one more favorable to the lessor prevails. *Id.* In other words, the language of an oil and gas lease is to be construed against the drafting party, in this case Jenkins and his successors in interest, Sklar and Samedan.

In reviewing section 17, the terms "waterflooding," "waterflood unit," "secondary recovery," or similar terms are not present anywhere in the pooling paragraph, or for that matter anywhere else in the Freeman Lease. The first express mention of the creation of a waterflood unit was in the Waterflood Unit Agreement which was circulated and rejected by the Freeman sisters. The only other express mention of a waterflood unit was in the lease amendment Sklar attempted to obtain from the Freeman sisters, but which they refused to sign. It is noteworthy that Sklar, at least initially, thought it necessary to amend the lease to include the right to form a waterflood unit. It is clear that, at best, the Freeman Lease is silent as to the right of the lessee to involuntarily include the lessor's interest in a waterflood unit.

A field-wide secondary recovery waterflood unit differs from a "drilling or production unit" in several respects. A drilling or production unit is normally more limited in size than a field-wide secondary recovery unit. The pooling provisions of a lease provide certain constraints on the size of a "drilling or production unit." In the Freeman Lease, an oil unit cannot exceed 40 acres and a gas unit 640 acres, plus or minus a ten percent tolerance, unless the Texas Railroad Commission changes the field rules to allow for a larger unit. In the case before us, the Texas Railroad Commission never changed the field rules, although it did approve the Waterflood Unitization Agreement signed by many of the working and royalty interest owners in the field. Again, the Freeman sisters never signed this agreement, and the orders of the Texas Railroad Commission approving the Waterflood Unitization Agreement expressly state that it would not bind interest owners who did not execute the agreement. It also states that non-signers would continue to participate in the field based on existing field rules and the terms of their individual leases; and that the rights of non-signers of the agreement would continue as though the unit agreement had never existed.[6]

6. Special Order Numbers 6–57,637 and 6–57,638 of the Texas Railroad Commission both state: (4) That such [waterflood unit] agreement does not bind any person who does not execute same, but binds only the persons who execute it, their heirs, successors, assigns and legal representatives. (5)[T]hat the owners of interests not desiring to enter such unit on the yardstick basis provided may refuse to join in the unitized op-

Special Order Numbers 6–57,637, 6–57,638, Texas Railroad Commission. Therefore, the maximum unit size for a "drilling or production unit" under the Freeman Lease was 88 acres, not the nearly 1,414 acres in the Hill Zone Waterflood Unit or the 1,529 acres in the Mitchell Zone Waterflood Unit.

A waterflood unit differs from a typical production unit in another respect. The size of a production unit is based upon the approximate size which the Texas Railroad Commission determines a producing well will drain when that well is either flowed or pumped, normally 80 acres for an oil well and 640 acres for a gas well. It involves the extraction of oil or gas from the ground and surrounding reservoir. The size of a waterflood unit on the other hand is not based upon the drainage area of a single production well, but on the size of the entire field and all of the production wells within that field. In this case, the waterflood units in question totaled almost 3,000 acres, and involved many wells and many production units.

■ In a secondary recovery waterflood project, water is injected into wells on one side of the field in an effort to force the oil toward wells on the other side of the field. A natural result is that some wells in the field will produce more oil, while others will produce less. This leads to a disparity in production, and thus income, for the various mineral and royalty interest owners in the field. As part of any waterflood unit agreement, all of the interest owners must agree on a method of sharing in the production from the project. This is part of the consideration for entering into the waterflood unit agreement. In the case before us, 99.65% of the royalty interest owners agreed on a complicated formula for sharing in the proceeds of the secondary recovery operation.[7] The Freeman sisters, however, were part of the 0.35% who did not agree. Accordingly, the Freeman sisters should have been entitled to their share of whatever oil was actually produced from their well, whether it would be more or less than they would otherwise have received absent the waterflood project. The Freeman sisters' only agreement was with their lessee under the Freeman lease, and those rights and obligations could not be enlarged or diminished on the basis of what others in the field

erations and continue to participate in the production from the field on an independent basis governed by Commission rules and regulations for said field, and by the provisions of the individual lease contract. (6) That the rights of all owners of all interests in the field, whether signers of the unit agreement or not, will be protected under its operation; ... that the rights and interests of non-signers are not included, involved or interfered with by the action of this agreement so they may continue to own and operate their properties, at their own election, as though said unit agreement had never been established.

7. It should be noted that under the complicated formula provided in the Waterflood Unit Agreement, the Freeman sisters' participation in production from the waterflood units would have been on less than a surface acreage basis as provided in the Freeman Lease. For example, their interest in the Hill Zone Waterflood Unit would have been 0.001402 on a surface acreage basis, it was only 0.000583 for Phase I and 0.000536 for Phase II under the Waterflood Unit Agreement; and for the Mitchell Zone Waterflood Unit their interest on a surface acreage basis would have been 0.001296, it was only 0.000020 for Phase I and 0.000061 for Phase II under the Waterflood Unit Agreement. Paragraph 17 of the Freeman Lease provides for allocation of production on a surface-acreage basis, as does the TEX. NAT. RES.CODE ANN. § 102.051 (Vernon 1993), "unless the Commission finds that such allocation does not allocate to each tract its fair share." Id. See also Railroad Comm'n v. Pend Oreille Oil & Gas Co., 817 S.W.2d 36, 43 (Tex.1991). The Commission made no such finding in this case.

may have agreed to do. And, although the Texas Railroad Commission had the authority to approve the waterflood project in order to promote conservation, it did not have authority to modify the contractual relationship existing between the parties by virtue of the Freeman Lease.[8] It is again noteworthy that the Texas Railroad Commission apparently recognized this and specifically excluded non-signing parties from its orders. *See* Special Order Numbers 6–57,637 and 6–57,638 at footnote 6.

The Freeman sisters were free to demand compliance with the terms of their lease, and Sklar was free to form the waterflood unit. But both were contractually bound by the terms of the Freeman Lease, which dictated the consequences of their choices. Had Sklar chosen to drill a new water injection well at a different site, the Price Oil Well may have produced for years, thereby holding the lease by production. Or, had Sklar chosen to convert the Price Oil Well to a water injection well, but first drilled another oil or gas well on other acreage which could have been pooled in a production unit with some of the Freeman Lease acreage, it could have held the Freeman Lease as long as such oil or gas well continued to produce. Or, had Sklar farmed-out its acreage to TXP and TXP completed the Price Gas Well before Sklar converted the Price Oil Well to a water injection well, it could have held the Freeman Lease by production. However, Sklar chose to convert the Price Oil Well to a water injection well at a time when the Freeman Lease was not other-

wise held by production of any kind. After Sklar commenced the waterflood project, the Freeman Oil Well never produced another drop of oil, nor did any other well within the 88 acre Freeman Oil Unit. When Sklar made the decision to convert the Freeman Oil Well to a water injection well to benefit its interests and the interests of the other members of the Waterflood Unit Agreements, it did so at its peril with regard to its obligations under the Freeman Lease to its lessors, the Freeman sisters. The consequence of that decision was that the Freeman Lease terminated sixty days later by reason of cessation of production of oil and gas. *See Southland Royalty Co. v. Humble Oil & Ref. Co.*, 151 Tex. 324, 249 S.W.2d 914, 916 (1952); *Marifarms Oil & Gas, Inc. v. Westhoff*, 802 S.W.2d 123, 126–27 (Tex.App.—Fort Worth 1991, no writ); *Geo–Western Petroleum Dev. v. Mitchell*, 717 S.W.2d 734, 736 (Tex.App.—Waco 1986, no writ).

Appellees rely upon a series of cases in support of their interpretation of the lease. *See Miller v. Crown Central Petroleum Corp.*, 309 S.W.2d 876, 877–78 (Tex.Civ.App.—Eastland 1958, writ dism'd by agr.); *Robinson v. Robbins*, 487 S.W.2d 794, 797–98 (Tex.Civ.App.—Tyler 1972), *rev'd on other grounds*, 501 S.W.2d 865 (Tex.1973); *Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 811 (Tex.1972). However, none involve the specific issue before us. They all speak to a lessee's right to reasonably use the surface estate to benefit a waterflood operation. None of them address the issue of a lessee's attempt to involuntarily pool leased acreage into a waterflood unit. We

---

8. *See* TEX. NAT. RES.CODE ANN. § 101.012 (Vernon 1993) providing that "[a]greements for pooled units and cooperative facilities do not bind a landowner, royalty owner, lessor, lessee, overriding royalty owner, or any other person who does not execute them. The agreements bind only the persons who execute them.... No person shall be compelled or required to enter into such an agreement." *Also see Halbouty v.Railroad Comm'n*, 163 Tex. 417, 357 S.W.2d 364, 376 (1962) and *Colorado Interstate Gas. Co. v. Sears*, 362 S.W.2d 396, 402 (Tex.Civ.App.—Austin 1962, writ ref'd n.r.e.) interpreting article 6008b, which preceded section 101.012.

briefly discuss each of these cases because, if anything, their reasoning supports our decision on this issue.

In *Miller*, a surface owner sought an injunction to prevent a lessee from laying a saltwater pipeline across his land to benefit a waterflood unit into which the surface owner's land had been pooled. *Miller*, 309 S.W.2d at 877. Even though the lease did not specifically grant the right to conduct a waterflooding program, the court held that the lessees had the right to pipe water across the leased land. *Id.* at 879. Appellee cites *Miller* for the proposition "that the right to develop the premises includes pooling the lease in a waterflood unit; thus the ordinary pooling clause found in an oil and gas lease includes pooling or unitization for waterflooding." We do not read *Miller* so broadly. The implied right to reasonably use the surface to benefit the leasehold estate is unrelated to the right to involuntarily pool a lease against the wishes of the lessor. In *Miller* "all the owners of minerals and royalty, including the lessors and lessees of the two tracts in which the Millers own[ed] the surface" entered into an agreement to pool their acreage into a waterflood unit. *Id.* at 877. This is not the case before us, because the Freeman sisters, as lessors, never agreed to pool their interest into the waterflood unit. The pooling of acreage by agreement of all lessors and lessees into a waterflood unit is quite different from giving a lessee the right to involuntarily pool that acreage against the wishes of the lessor.

Appellees argue that the Texas Supreme Court has held that there is an implied right to waterflood because the waterflood operation is reasonably necessary to carry out the purposes of the lease. *Sun Oil Co.*, 483 S.W.2d at 811. Again, this was a surface water usage case, not a pooling case. Although the court did hold that

there was an implied obligation for reasonable use of water from the surface estate to benefit the leasehold estate which was part of a waterflood project, it did not address the right to use that water for the benefit of production from acreage not covered by the lease, but still within the waterflood unit. A year later, the court clarified its refusal not to expand this usage to other acreage not covered by the lease, but still within the waterflood unit. *See Robinson v. Robbins*, 501 S.W.2d 865 (Tex. 1973).

In *Robinson v. Robbins*, 487 S.W.2d 794, 797–98 (Tex.Civ.App.—Tyler 1972), *rev'd on other grounds*, 501 S.W.2d 865 (Tex. 1973), the surface owner sought damages for saltwater taken from the Wagoner lease to benefit other leases within the waterflood unit. *Id.* Appellees cite the opinion for the proposition that production from a waterflood unit holds the lease. However, *Robinson* does not deal with holding a lease by production or involuntary pooling. In the underlying suit, the surface owner sued for damages because the lessee used saltwater to benefit the waterflood unit. The Tyler Court of Appeals held that the surface owner was not entitled to compensation for saltwater taken from its lease to be used for the production of oil off of the lease, but within the waterflood unit. *Id.* The supreme court reversed holding that the surface owner was "entitled to recover the value of that portion of the saltwater which has been consumed for the production of oil for owners of lands outside the Wagoner lease." *Robinson v. Robbins*, 501 S.W.2d 865, 868 (Tex.1973). In his well reasoned opinion, Justice Reavley wrote: "Even if the waterflood operation is reasonably necessary to produce oil from the premises of the Wagoner lease, it does not follow that the operator is entitled to the use of Robinson's surface for the secondary recovery unit that includes acreage outside the

Wagoner lease." *Id.* at 867. Thus, the supreme court has been reluctant to extend the rights and obligations arising under an oil and gas lease to acreage outside of the lease, but within a waterflood unit.

In *Robinson,* the supreme court went on to discuss the effect of the Railroad Commissioner's orders approving the waterflood units stating:

> The fact that the Railroad Commission entered orders approving the recovery units may be relevant to the propriety of the use of the water for production from lands of the Wagoner lease, but no statute or order purports to diminish the title or otherwise extend the burden upon Robinson's surface estate.

*Id.* at 868. Likewise, the fact that the Railroad Commission entered orders approving a secondary recovery project should not enlarge or diminish the pooling rights or obligations of the lessor or lessee under an oil and gas lease, unless the lease specifically provides therefor or the parties agree to the secondary recovery project. In the case before us, the Freeman Lease does not specifically provide therefor and the Freeman sisters did not agree to participate in such a secondary recovery waterflood unit. We decline to imply such a provision into the pooling provision of paragraph 17 of the Freeman Lease.

For the reasons stated, we sustain Appellants' issues one through four.

### AFFIRMATIVE DEFENSES

■ In issues five through eleven, fourteen and fifteen, Appellants argue that none of the affirmative defenses of laches, estoppel or waiver raised by Appellees in their response to Appellants' Motion for Partial Summary Judgment have merit. Appellees argue that partial summary judgment for Appellants would be improper because of existing fact issues on these affirmative defenses. In considering these issues, we need go no further than issue number five.

■ In issue number five, the Freeman sisters maintain that once the Freeman Lease terminated by its own terms, no affirmative defense asserted against it can change the fact that the lease terminated. Stated another way, once a lease has terminated by its own terms, as we have found the Freeman Lease did, can it be "unterminated" by subsequent actions of the lessor? Can a terminated lease be revived once it has expired? Can life be breathed back into it "by principles of estoppel, waiver and laches," as argued by Appellees? We conclude that "once a lease terminates by its own terms, it cannot be ratified or revived." *Ladd Petroleum Corp. v. Eagle Oil & Gas Co.,* 695 S.W.2d 99, 109 (Tex.App.—Fort Worth 1985, no writ); *accord Woodson Oil Co. v. Pruett,* 281 S.W.2d 159, 164 (Tex.Civ. App.—San Antonio 1955, writ ref'd n.r.e.); *Loeffler v. King,* 228 S.W.2d 201, 207 (Tex. Civ.App.—Fort Worth 1950), *rev'd on other grounds,* 149 Tex. 626, 236 S.W.2d 772 (1951).

Although the above-cited cases deal with the affirmative defenses of ratification, estoppel, and waiver, these doctrines overlap with that of laches, as acknowledged by Appellees in their brief.[9] In *Ladd Petroleum Corp.,* the court of appeals reversed and remanded a lease termination case on the issue of production in paying quantities, but went on to address the issues of

---

9. In Appellees' Brief at page 34, Appellees state: "For reasons similar to those suggested in footnote 33 of the Freeman's brief, this Court may wish to consider treating laches as overlapping with the doctrines of waiver and estoppel. [Appellants'] Brief at 36. The same facts implicate them all." We agree and so consider estoppel, waiver and laches as overlapping in application and principle to a lease termination case.

ratification and estoppel, which could arise on retrial. The court stated that "once a lease terminates by its own terms, it cannot be ratified or revived." *Ladd Petroleum Corp.,* 695 S.W.2d at 109. In *Woodson Oil Co.,* the court held the following:

> There is no principle of forfeiture involved when a lease is terminated by its own provisions for cessation of production .... "[i]t seems to be well settled in the law that the mere receipt of payments on account of minerals taken from one's own property does not operate as a waiver of, or an estoppel to assert, the claim that the rights of the taker as lessee have terminated."

*Woodson Oil Co.,* 281 S.W.2d at 164, *citing Gas Ridge v. Suburban Agr. Properties,* 150 F.2d 363, 365 (5th Cir.1945). And in *Loeffler,* the court held that "even though lessors did silently permit the improvement and development of the property after the termination of the lease, they are not now estopped to plead the termination thereof." *Loeffler,* 228 S.W.2d at 207.

Appellees rely upon *Benavides v. Warren,* 674 S.W.2d 353 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.), for the proposition that a finding of laches is a proper defense to a suit for lease termination. *Benavides* involves the termination of certain non-participating term royalty which was conveyed by royalty deed for a term of ten years and so long thereafter as "oil, gas and other minerals are produced in paying quantities." The grantors under the royalty deed sought termination of the royalty because of a lapse in production occurring after the expiration of the ten year primary term of the conveyance. The trial court found in favor of the grantees and entered numerous findings of fact and conclusions of law that the non-participating royalty did not terminate due to a cessation of production. On appeal, one of the issues addressed was the legal and factual sufficiency of the evidence supporting the trial court's finding of laches. The court stated:

> It is undisputed plaintiffs failed to assert their claim that defendant's royalty interest had terminated until seven years after the purported cessation of production. Thomas, the oil and gas operator, testified that had the suit been filed soon after the purported cessation, it would have been easier to discover the scope of production as well as operating costs. This testimony is uncontroverted. The seven year delay in filing suit made it more difficult to retrieve the evidence. We find that the evidence is sufficient to support the findings of the trial court in determining the plaintiffs to be guilty of laches, and we note that this alone suffices to bar the suit. The point is overruled.

*Benavides,* 674 S.W.2d at 362 (citation omitted). However, we note that the court only addressed the factual sufficiency of the evidence to support the trial court's finding of laches. The issue of the viability of a laches defense in a lease termination case was never raised in the trial or appellate court. Consequently, we do not find this case persuasive on the issue before us.

For the reasons stated, we sustain issue number five and do not find it necessary to address issues six through eleven, fourteen and fifteen.

### JOINDER OF PARTIES

In issue number sixteen, Appellants argue that the trial court can adjudicate the parties' claims and grant complete relief without the joinder as parties of all other mineral interest owners in the Price Gas Unit. Appellees argue that such absent parties are necessary and indispensable parties, and without their joinder Appellants are entitled to no relief on the claims

they have asserted against Appellees. Appellees further argue that the trial court properly denied Appellants' Motion for Partial Summary Judgment on this basis. In the Final Judgment, however, the trial court specifically stated "Defendants' alternative request for relief that all related claims for relief and damages be severed and dismissed from this lawsuit [for non-joinder of parties] need not be reached by the Court." The trial court did not reach the issue of joinder of parties in light of the disposition it chose to make in granting Appellees' Motion for Partial Summary Judgment and denying Appellants'. We view this not as a final summary judgment issue, but as a Plea in Abatement issue.

It is important to note that neither party in this case moved for final summary judgment in this case; both moved only for partial summary judgment. This judgment became final by reason of the parties' stipulation as to what royalties would be due in the event the Freeman Lease had not terminated. Since we have held that the Freeman Lease did terminate, that stipulation is no longer effective and there is no final judgment to enter. We therefore return the case to its pre-final judgment status with pending motions for partial summary judgment with instructions to the trial court for further proceedings consistent with this opinion. Appellees' joinder of parties claim should be addressed by the trial court in the context of Appellees' Plea in Abatement and the remaining issues pending in this case. *See United Parcel Service, Inc.*, 25 S.W.3d at 917; *Members Ins. Co.*, 803 S.W.2d at 465. Issue number sixteen is overruled.

### Conclusion

For the reasons stated, the final judgement of the trial court is *reversed* and this case is *remanded* for further proceedings consistent with this opinion.