# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 8, 2008

Charles R. Fulbruge III
Clerk

No. 07-40636

FRANK D. YTURRIA, Trustee of the Frank D. Yturria Mineral Trust, et al.

Plaintiffs-Appellees

v.

KERR-MCGEE OIL & GAS ONSHORE, LLC, KERR-MCGEE OIL & GAS
ONSHORE, LP, doing business as KMOG ONSHORE LP

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Texas
USDC No. M-05-181

Before PRADO, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

This appeal involves the proper interpretation of uniquely worded natural
gas liquid royalty provisions in four oil and gas leases entered into as part of a
settlement agreement following litigation over the meaning of prior lease
language. The provisions require lessees Kerr-McGee Oil & Gas Onshore, LP
and Kerr McGee Oil & Gas Onshore, LLC (collectively Kerr-McGee) to pay
Lessors, as a royalty, a certain percentage of "all plant products, or revenue

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

derived therefrom, attributable to gas produced by [Kerr-McGee] from the leased premises." Lessors sued Kerr-McGee, alleging that Kerr-McGee improperly paid royalties due under these provisions based on the revenue that it received for natural gas liquids from its third-party processor–a sum that includes deductions for the processor's transportation and fractionation costs. According to Lessors, the leases require Kerr-McGee to calculate royalties based on the total revenue generated by the natural gas liquids, exclusive of these third-party costs. The district court agreed, granting summary judgment that the leases unambiguously require Lessors' method of calculating royalties. We agree that Lessors' interpretation is the correct one and thus affirm the district court's judgment.

## I. BACKGROUND

This appeal arises from a dispute over how Kerr-McGee pays royalties for natural gas liquids, also referred to as plant products, under Lessors' oil and gas leases in Starr and Hidalgo Counties, Texas. The Lessors are royalty interest owners of four oil and gas leases of which Kerr-McGee and its predecessors in interest are the lessees. The four leases consist of the I.Y. Garcia Lease, the J.A. Garcia Lease (collectively, the Garcia leases), the Yturria 600-Acre Lease, and the Yturria 350-Acre Lease (collectively, the Yturria leases). Although the leases contain slight variations (noted herein when relevant), they are similar in most pertinent respects.

Since 1983, Kerr-McGee has drilled and put into production a number of gas wells on the leased premises. In order to sell to consumers the natural gas liquids produced by these wells, the gas must be processed and fractionated in a gas plant. To accomplish this, Kerr-McGee uses pipelines to transport the natural gas liquids to processing plants. The plants are owned by third-party processors that contracted with Kerr-McGee to transport, process, and fractionate the gas generated from the leased premises.

In 1993, Lessors sued Kerr-McGee in two actions separate from this case. The Lessors claimed that Kerr-McGee impermissibly deducted transportation and treating charges from natural gas liquid revenue prior to calculating the Lessors' royalties. Kerr-McGee took the position that these deductions were proper and not barred by the leases. The 1993 lawsuits ended in settlement.

At the time of the 1993 suit, the leases required Kerr-McGee to pay Lessors a royalty on 100% of the "revenue . . . received by Lessee [Kerr-McGee]" for the natural gas liquids. As part of the settlement, however, the parties amended the leases' natural gas liquid royalty provisions. The amended royalty clauses are the central provisions at issue in this appeal. Those provisions now require Kerr-McGee to pay Lessors "a royalty of one-fourth (1/4th) of seventy-five percent (75%) of all plant products, or revenue derived therefrom, attributable to gas produced by [Kerr-McGee] from the leased premises." The Garcia leases include additional language after "revenue derived therefrom" as follows: "(whether or not Lessee's processing agreement entitles it to a greater or lesser percentage)." Except as amended, the leases remained in full force and effect as written.

The settlement did not result in amendment to the leases' separate "no deduct" provisions. The "no deduct" provisions vary slightly in the Garcia and Yturria leases. In the Garcia leases, the provision states:

> Lessor's royalty shall never bear, either directly or indirectly, any part of the costs or expenses of production, gathering, dehydration, compression, transportation (except transportation by truck), manufacture, processing, treatment or marketing of the oil or gas from the leased premises, nor any part of the costs of construction, operation or depreciation of any plant or other facilities or equipment for the processing or treating of said oil or gas produced from the herein leased premises . . . .

In the Yturria leases, the provision states:

> Lessor's royalties hereunder shall never be subject to any amortization or interest or investment charge or deduction for

transporting the same to a pipeline, or for gathering, transporting, producing, treating, separating, storing, compressing, dehydrating or marketing the same . . . .

In 1997, Kerr-McGee entered into a new agreement for the processing, transporting, and fractionating of natural gas liquids with a third-party processor, Enterprise. Under the Enterprise agreement, natural gas liquids are transferred from the leased premises to Enterprise's plants in Delmita and Gilmore, Texas where Enterprise processes the gas. Once processed, title to the gas passes to Enterprise. Enterprise then transports the gas to its plant in Corpus Christi where the gas is fractionated into natural gas liquid components such as propane, ethane, butane, and pentane. Enterprise then sells the gas. Under the Enterprise agreement, Kerr-McGee receives 80% of Enterprise's "Net Proceeds," which consist of the total value of the fractionated natural gas liquids (based on price averages) minus product marketing, transporting, and fractionating costs. Because Enterprise does not know its actual transportation and fractionation costs when Kerr-McGee is compensated, the Enterprise agreement uses transportation and fractionation costs mutually agreed upon to calculate the price owed to Kerr-McGee. Thus, the price is calculated on index prices for the various plant products, not prices specific to the Corpus Christi plant.

In 2003, Lessors audited Kerr-McGee's method of paying natural gas liquid royalties under the leases. The audit revealed that Kerr-McGee was deducting Enterprise's transportation and fractionation costs prior to calculating Lessors' royalties. In other words, Kerr-McGee was calculating Lessors' royalties based on the revenue that Kerr-McGee received from Enterprise (which includes deductions for Enterprise's transportation and fractionation costs) rather than on the total revenue generated by the natural gas liquids, exclusive of costs.

In May 2005, Lessors filed a complaint against Kerr-McGee, alleging that this conduct violated the leases. In its answer, Kerr-McGee admitted that it takes into account transportation and fractionation costs prior to calculating Lessors' royalties, but asserted that the leases require this method of calculation. Kerr-McGee also raised affirmative defenses of waiver, estoppel, and ratification based on the parties' 1993 dispute and subsequent settlement.

Lessors moved for partial summary judgment arguing that the unambiguous language of the leases precluded Kerr-McGee from taking into account transportation and fractionation costs prior to calculating Lessors' royalties. Kerr-McGee filed a combined reply and cross-motion for summary judgment arguing that the unambiguous language of the leases demonstrated that it had properly calculated and paid royalties, and that Kerr-McGee's affirmative defenses of waiver, estoppel, and ratification established, as a matter of law, that Lessors could not sue to recover alleged underpayments of natural gas liquid royalties. Lessors filed a cross-motion for summary judgment on Kerr-McGee's affirmative defenses, asserting that they were entitled, as a matter of law, to sue for alleged royalty underpayments.

The district court granted Lessors' motion for partial summary judgment on the contract interpretation issue, denied Kerr-McGee's cross-motion for summary judgment, and granted Lessors' cross-motion for summary judgment on Kerr-McGee's affirmative defenses.

The parties thereafter stipulated and agreed to damages and expert witness fees. After a bench trial on the remaining issue of attorneys' fees, the district court entered a final judgment, incorporating the parties' stipulations and awarding damages, costs, and fees to Lessors. This appeal followed.

## II. DISCUSSION

Kerr-McGee challenges the district court's judgment on two grounds. First, it contends that the district court erred in granting summary judgment that the unambiguous language of the leases requires Kerr-McGee to calculate Lessors' royalty based on the total revenue derived from the natural gas liquids, exclusive of transportation and fractionation costs. Second, Kerr-McGee argues that the district court improperly granted summary judgment for Lessors on Kerr-McGee's affirmative defenses of waiver, estoppel, and ratification.

In assessing Kerr-McGee's challenges, we review the district court's summary judgment de novo, viewing the evidence in the light most favorable to Kerr-McGee, the party opposing the judgment. Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000). Summary judgment is appropriate if there is no genuine issue of material fact and Lessors are entitled to judgment as a matter of law. Id.

A. Natural Gas Liquid Royalties

We turn first to the parties' dispute over the proper method of calculating Lessors' royalty under the leases' natural gas liquid royalty provisions. In relevant part, the provisions read:

> If gas . . . produced from the leased premises is processed in a hydrocarbon recovery plant for the recovery of liquid and/or liquefied hydrocarbons therefrom, and if [Kerr-McGee] . . . receives plant products, or revenue attributable thereto, then Lessor[s] shall receive as a royalty one-fourth (1/4th) of seventy-five percent (75%) of all plant products, or revenue derived therefrom, attributable to gas produced by [Kerr-McGee] from the leased premises.

The parties agree that the phrase "revenue derived therefrom" governs the proper payment of royalties under these provisions. They further agree that the term "revenue," as used in the royalty provisions, refers to the total income produced by a given source, exclusive of costs. The parties disagree, however, on what source of revenue Kerr-McGee must use to calculate Lessors' royalties. According to Kerr-McGee, the relevant source of revenue is the payment that

Kerr-McGee receives from Enterprise when title to the natural gas liquids passes to Enterprise under the Enterprise agreement, i.e., the value of the fractionated natural gas liquid components at the point of sale minus Enterprise's transportation and fractionation costs. In contrast, Lessors contend that the relevant source of revenue is the gross revenue, i.e., the index price per gallon of all plant products, before the deduction of any transportation and fractionation costs.

At the outset, it is important to note that we are construing unique language in four particular oil and gas leases. The vast majority of oil and gas leases use judicially defined terms such as "market value at the well" or "amount realized" to measure the lessor's royalty. See generally Heritage Res., Inc. v. Nationsbank, 939 S.W.2d 118, 124-31 (Tex. 1996) (Owen, J., concurring) (discussing the meaning of "market value at the well"); Tana Oil & Gas Corp. v. Cernosek, 188 S.W.3d 354, 360 (Tex. App.—Austin 2006, pet. denied) (discussing the meaning of "amount realized"). Here, in contrast, the parties have opted to use the previously unconstrued phrase "revenue derived therefrom" in the context of a settlement of a previously litigated dispute over this very issue. Thus, cases construing leases that use judicially defined terms provide little guidance concerning how the uniquely worded leases here should be construed. As Texas courts have recognized, the specific language of the lease provisions at issue determine how the parties must calculate royalties. See Heritage, 939 S.W.2d at 124 (Owen, J., concurring).

(1) Governing rules of construction

Under Texas law,[1] an oil and gas lease is a contract and its terms are interpreted as such. See Anadarko Petroleum Corp. v. Thompson, 94 S.W.3d 550, 554 (Tex. 2002). In construing an unambiguous lease, our primary duty is to ascertain the parties' intent as expressed by the words of their agreement. Id. In so doing, we consider the wording of the lease in light of the circumstances surrounding its adoption and apply the rules of construction to determine its meaning. Sun Oil Co. v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981). We must give contractual terms their plain and ordinary meaning unless the instrument shows the parties' intent to use the terms in a different sense. Heritage, 939 S.W.2d at 121. We "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). If, after applying the pertinent rules of construction, the lease remains subject to two or more equally reasonable interpretations, Texas cases counsel that we adopt the interpretation more favorable to the lessor. Zeppa v. Houston Oil Co., 113 S.W.2d 612, 615 (Tex. App.—Texarkana 1938, writ. ref'd) ("[I]t appears to be the settled rule in this state that of two or more equally reasonable constructions of which the language of an oil and gas lease is susceptible the one more favorable to the lessor will be allowed to prevail."); see also Champlin Petroleum Co. v. Ingram, 560 F.2d 994, 998 (10th Cir. 1977) (applying Texas law); Freeman v. Samedan Oil Corp., 78 S.W.3d 1, 7 (Tex. App.—Tyler 2001, pet. granted, judgm't vacated w.r.m.); Sirtex Oil Indus., Inc. v. Erigan, 403 S.W.2d 784, 788 (Tex. 1966) ("[A] lease will be most strongly construed against the lessor.").

---

[1] As all the leases were negotiated and executed in Texas, Texas law governs their interpretation. See H E Butt Grocery Co. v. Nat'l Union Fire Ins. Co., 150 F.3d 526, 529 (5th Cir. 1998) (Texas law controls the interpretation of contracts negotiated, drafted, and executed in Texas).

(2) The "No Deduct" Provisions

In concluding that Lessors' royalty under the natural gas liquid royalty provisions cannot include deductions for Enterprise's transportation and fractionation costs, the district court relied heavily on the leases' separate "no deduct" provisions. The Lessors do the same in this appeal. Those provisions provide, respectively, that Lessors' royalty shall not bear deductions for "transportation," "processing," and "treatment" costs (Garcia leases), and for "transporting," "producing," "treating," and "separating" costs (Yturria leases). The language of these clauses is no doubt broad enough to include Enterprise's transportation and fractionation costs. But the breadth of the "no deduct" provisions is only half the issue. First, we must specifically identify that from which deductions may not be made pursuant to the "no deduct" provisions. Here, the "no deduct" provisions in both the Garcia and Yturria leases apply only to "Lessor's royalty."[2]

The Texas Supreme Court explained the significance of this limitation in Heritage, 939 S.W.2d at 118. Like this case, Heritage involved the question of how to properly calculate the royalties owed a group of lessors under oil and gas leases. Id. at 121. The relevant royalty provisions required the lessee to pay the lessors a certain percentage of the "market value at the well for all gas . . . produced from the leased premises." Id. at 120-21. The leases also contained a "no deduct" provision similar to those at issue here. The provision provided that "there shall be no deductions from the value of the Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas." Id.

The lessee in Heritage deducted the post-production cost to transport gas from the wellhead to the point of sale from the sales price before calculating the

_____

[2] The Yturria leases use the plural "Lessor's royalties."

9

lessors' royalties. Id. at 120. As in this case, the lessors sued for breach of contract, arguing that the deductions violated the leases' "no deduct" provision. In assessing this claim, the Texas Supreme Court did not directly address the apparent conflict between the definition of "market value at the well"[3] (which required that post-production costs be deducted from lessors' royalty) and the "no deduct" provision (which appeared to prohibit deducting such costs). Rather, the court looked first to the applicability of the "no deduct" provision, which prevented deductions only from the "value of the Lessor's royalty." Id. at 122. According to the court, the "value of the Lessor's royalty" was the market value of the gas at the well—a measure which requires a deduction for post-production costs. Id. The court thus concluded that the leases' "no deduct" provision was "surplusage as a matter of law." Id. at 123.

Accordingly, under Heritage, to determine whether a lessee has made improper "deductions" from a lessor's royalty, one must start with the royalties that the lease entitles the lessor to. Justice Owen's Heritage concurrence succinctly makes this point:

> It is clear certain "deductions" are prohibited. The question that must be answered is from what are deductions prohibited. The clause says "from the value of the Lessor's royalty." The value of the Lessor's royalty is "market value at the well" for gas sold off the leased premises.

Id. at 130 (Owen, J., concurring).

Likewise, we must determine the value of Lessors' royalty before accessing the impact of the leases' separate "no deduct" provisions. To do so, we turn to the leases' natural gas liquid royalty provisions.

(3) The Natural Gas Liquid Royalty Provisions

---

[3] Under Texas law, "market value at the well" is generally determined by comparable sales. Heritage, 939 S.W.2d at 122. In cases such as Heritage, however, where evidence of comparable sales is unavailable, market value is determined by subtracting reasonable post-production marketing costs from the market value at the point of sale. Id.

Those provisions require Kerr-McGee to pay Lessors "a royalty of one-fourth (1/4th) of seventy-five percent (75%) of all plant products, or revenue derived therefrom, attributable to gas produced by [Kerr-McGee] from the leased premises." The parties initially focus on the word "derive," citing a host of dictionary definitions in support of their proposed constructions. These dictionary definitions are not dispositive of the issue and, regardless, the word "derive" can be interpreted to support both parties' constructions.

a. Kerr-McGee's Proposed Interpretation

In support of its proposed method of calculating royalties, Kerr-McGee notes that its obligation to pay royalties arises only after it receives revenue attributable to extracted natural gas liquids. Because Kerr-McGee receives such revenue only from Enterprise via the terms of the Enterprise agreement, Kerr-McGee argues that the revenue it receives from Enterprise is inextricably intertwined with the royalties it must pay Lessors. Thus, under Kerr-McGee's reading, "if gas . . . produced from the leased premises is processed in a hydrocarbon recovery plant for the recovery of liquid and/or liquefied hydrocarbons therefrom, and if [Kerr-McGee] . . . receives plant products, or revenue attributable thereto," (emphasis added), then it must pay one-fourth of seventy-five percent of that revenue to Lessors as a royalty.

Kerr-McGee's construction of the royalty provisions is consistent with the general definition of "royalty" under Texas law, which includes deductions for post-production costs such as treatment and transportation costs. See id. at 122. Moreover, as Kerr-McGee implicitly argues, it is certainly more reasonable to assume that a party would agree to pay royalties based on the revenue it receives for gas, rather than on the gross revenue received for that gas by a third party at the point of sale. As Kerr-McGee notes, title to the natural gas liquids passes to Enterprise before the gas is even fractionated. Thus, under Lessors' proposed construction, they receive the full benefit of Enterprise's transporting,

fractionating, and marketing efforts, yet bear none of the costs–costs which Kerr-McGee, the party paying the royalty, does bear. Of course, this construction fails to acknowledge the lawsuit and settlement context in which the language in question arose.

Kerr-McGee also argues that its construction is supported by Lessors' option to take their royalty "in kind." Kerr-McGee argues that the in-kind option demonstrates the absurdity of Lessors' proposed construction because, if Lessors' royalties are based on Enterprise's gross revenue, then Lessors should be able to go to Enterprise's Corpus Christi plant and demand that they be given their share of natural gas liquid components there. Kerr-McGee, however, fails to take into account the fact that the value of a royalty taken in-kind does not have to equal the value of a monetary royalty. See Mesa Operating Ltd. P'ship v. U.S. Dep't of Interior, 931 F.2d 318, 325 (5th Cir. 1991) (rejecting argument that royalty taken in kind must always be equal to royalty taken in value). Moreover, this entire argument is based on the flawed notion that, under Lessors' proposed interpretation, they would receive Enterprise's actual gross revenue for the natural gas liquids. But as mentioned, that is not the case. Under the Enterprise agreement, Kerr-McGee is compensated for extracted natural gas liquids based on index prices for the various plant products minus agreed-to transportation and fractionation costs. All that Lessors assert is that Kerr-McGee must calculate their royalty based on this total index price, exclusive of deductions for transportation and fractionation costs. This calculation is not dependent on the actual price that Enterprise receives for the plant products in Corpus Christi.

Finally, the leases contain a number of other gas royalty provisions. Most of these provisions are based on "gross proceeds," which the leases define as "the price received by [Kerr-McGee]." Additionally, several of these provisions require that certain post-production expenses incurred prior to the tailgate of the

processing plant, if deducted, must be added back to determine "gross proceeds" prior to calculating Lessors' royalties. But none of these "add-back" clauses require that Kerr-McGee add back Enterprise's downstream transportation and fractionation expenses prior to calculating Lessors' royalties, and indeed, some of them specifically exclude such add-backs. Although Kerr-McGee relies on these provisions in support of its proposed interpretation, we find them equally supportive of both parties' interpretations. On one hand, the provisions show that the parties generally intended to base Lessors' royalties on Kerr-McGee's revenue and also intended to deduct Enterprise's costs from those royalties. But on the other hand, the provisions show that the parties knew how to specifically provide for both of these things in a particular gas royalty provision, but chose not to do so in the leases' natural gas liquid royalty provisions.

b. Lessors' Proposed Interpretation

While Lessors concede that royalties under Texas law usually include post-production expenses, they note that parties are free to alter this general rule by agreement, and argue that is precisely what the parties did here. Lessors note that the leases' natural gas liquid royalty provisions do not say that Kerr-McGee must pay royalties based on the "total revenue derived" by Kerr-McGee; rather, the provisions say that Kerr-McGee must pay royalties based on "all plant products, or revenue derived therefrom, attributable to gas produced by [Kerr-McGee] from the leased premises." (emphasis added). Indeed, the parties chose this language to replace the phrase "revenue . . . received by Lessee [Kerr-McGee]" when they amended the royalty provision in settling Lessors' 1993 lawsuit. The amended language was a specific effort by Lessors to prevent Kerr-McGee from reducing Lessors' royalty through alleged "gamesmanship." In the 1993 lawsuit, Lessors alleged that Kerr-McGee abused the "revenue . . . received by Lessee [Kerr-McGee]" language by allowing its affiliate processor to retain more of the natural gas liquids, which reduced the revenue that Kerr-McGee

received and hence reduced the royalty Kerr-McGee ultimately owed Lessors. Thus, the language allowed Kerr-McGee, through its affiliate processor, to receive the full benefit of the natural gas liquids while at the same time decreasing the amount it owed Lessors as a royalty. The amendments were designed to address this problem.

Lessors argue that in order to adopt Kerr-McGee's proposed interpretation, we would have to ignore this amended language and simply read the provisions as if they still referred specifically to Kerr-McGee's revenue. Based on the amended language, Lessors argue that Kerr-McGee must pay royalties on "all" plant products or revenue derived from "all" plant products, attributable to the natural gas liquids. Lessors note that "revenue," when not expressly qualified by "net," means "[a]ll the income produced by a particular source." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1492 (4th ed. 2000). Thus, they argue that the revenue from "all" plant products is the amount realized from 100% of the plant products before deductions for post-production expenses.

c. Court's Interpretation

Based on the forgoing discussion, we conclude that only Lessors' interpretation gives effect to the specific manner in which the parties amended the royalty provisions following settlement of their 1993 dispute. The settlement context of the amendment is properly considered "surrounding circumstances" evidence under Madeley, 626 S.W.2d at 731. Thus, while we understand Kerr-McGee's concerns with the unusual breadth of Lessors' proposed interpretation, that fact is not sufficient to render Lessors' proposed interpretation unreasonable in light of the strong circumstantial evidence that "revenue derived therefrom" must mean something other than revenue obtained by Kerr-McGee.

We conclude that Lessors' interpretation is the correct one. That conclusion is particularly buttressed in the Garcia leases by the additional

language "(whether or not Lessee's processing agreement entitles it to a greater or lesser percentage)," which makes no sense if Kerr-McGee's revenue is the sole measure of Lessors' royalty, as Kerr-McGee argues.

Even if we were to conclude that both sides proffer reasonable interpretations of the leases, however, we would still affirm the district court's judgment. Kerr-McGee incorrectly asserts that any ambiguity in the leases makes the question of how to calculate royalties an issue of fact for the jury. For most contracts, that would be the case, see Geoscan, Inc. of Tex. v. Geotrace Techs., Inc., 226 F.3d 387, 390 (5th Cir. 2000), but here the two Yturria leases expressly provide that "[i]n the case of ambiguity, [the] Lease always shall be construed in favor of Lessor[s] and against [Kerr-McGee]." This contractual clause simply supplements Texas cases to the effect that if two equally reasonable interpretations of an oil and gas lease arise, the one more favorable to the lessors must be adopted. Zeppa, 113 S.W.2d at 615; see also Champlin, 560 F.2d at 998 (applying Texas law); Freeman, 78 S.W.3d at 7; Erigan, 403 S.W.2d at 788 ("[A] lease will be most strongly construed against the lessor."). This common law rule of construction also applies to the Garcia leases, which contain no express rule of construction.

In order to find for Kerr-McGee, as it impliedly conceded at oral argument, we would have to find that Kerr-McGee's construction is the only reasonable one. On this record, we cannot do that. Accordingly, we hold that the leases' natural gas liquid royalty provisions require Kerr-McGee to calculate Lessors' royalty based upon the Kerr-McGee/Enterprise index price per gallon for all plant products before deductions are made for transportation and fractionation fees, as the district court concluded.

## B. Kerr-McGee's Affirmative Defenses

Kerr-McGee also challenges the district court's ruling granting Lessors' motion for partial summary judgment on Kerr-McGee's affirmative defenses of

quasi-estoppel, waiver, and ratification. Initially, Kerr-McGee argues that the district court failed to apply the proper summary judgment standard. A party moving for summary judgment on an opponent's affirmative defense can obtain judgment as a matter of law by disproving an essential element of that defense. Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986). Here, while the district court may not have restated the proper standard as to each of Kerr-McGee's affirmative defenses, its analysis makes eminently clear that the proper standard was applied,[4] and accordingly the district court did not err.

We address, in turn, Kerr-McGee's remaining challenges to the judgment against its affirmative defenses.

(1) Quasi-Estoppel

The defense of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 864 (Tex. 2000). The defense applies when "it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." Id. Quasi-estoppel does not require a showing of misrepresentation or detrimental reliance. Atkinson Gas Co. v. Albrecht, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied).

Kerr-McGee asserts that the district court erred in concluding that Lessors' did not receive a benefit for the purposes of quasi-estoppel because, as part of the parties' prior settlement, "they received an additional royalty of 100%

---

[4] With respect to quasi-estoppel, the district court ruled that Kerr-McGee could not prove that Lessors had benefitted from accepting underpayments of royalties. With respect to waiver, the district court ruled that Kerr-McGee could not prove that Lessors had intentionally relinquished their right to have royalties calculated based on the total revenue derived from all natural gas liquids because the release language of the parties' prior settlement applied only to claims arising "prior" to the settlement date. Finally, relying on this circuit's precedent, the district court ruled that Kerr-McGee could not prove that Lessors ratified Kerr-McGee's method of calculating royalties merely by accepting less monies than they were owed.

of Enterprise's Net Proceeds." Kerr-McGee asserts that by accepting this additional royalty, which included a deduction for Enterprise's transportation and fractionation costs, Lessors should now be estopped from challenging Kerr-McGee's method of calculating royalties. But even assuming that Lessors knew how Kerr-McGee calculated the settlement royalty–a fact they adamantly deny–it is unclear how accepting this additional royalty constitutes a position inconsistent with their current claims. As part of the settlement, the parties fundamentally altered the leases' natural gas liquid royalty provisions, providing that royalties would be calculated based on the "revenue derived" from natural gas liquids rather than on the monies that Kerr-McGee received for natural gas liquids from a processor. Thus, even if Lessors' position in the prior settlement constituted an implicit admission that transportation and fractionation expenses were properly deductible under the old natural gas royalty provisions, there is nothing unconscionable about allowing Lessors to assert a new position, namely that transportation and fractionation expenses cannot be deducted under the new natural gas liquid royalty provisions. Indeed, the parties' settlement specifically contemplates that Lessors would retain the right to bring any new claims based on the underpayment of royalties under the new provisions. Accordingly, the district court properly granted summary judgment for Lessors on Kerr-McGee's quasi-estoppel defense.

(2) Waiver and Ratification

Under Texas law, the elements of wavier include: (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence, and; (3) actual intent to relinquish the right, which we can infer from conduct. ASI Techs., Inc. v. Johnson Equip. Co., 75 S.W.3d 545, 548 (Tex. App.—San Antonio 2002, pet. denied). Ratification requires: "(1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act." Motel Enters., Inc. v. Nobani, 784 S.W.2d

17

545, 547 (Tex. App.—Houston [1st. Dist.] 1990, no writ.) (unpublished). An implied ratification of conduct will only be found where there is full knowledge of the facts surrounding that conduct. Crooks v. M1 Real Estate Partners, Ltd., 238 S.W.3d 474, 488 (Tex. App.—Dallas 2007, pet. denied).

As to both defenses, Kerr-McGee argues that a fact issue exists concerning whether Lessors had notice of Kerr-McGee's practice of deducting Enterprise's transporting and fractionating expenses from Lessors' royalties prior to the audit that led to this lawsuit. According to Kerr-McGee, Lessors' decision to accept alleged underpayments of royalties, knowing Enterprise's transporting and fractionating costs were being deducted, constituted both an implied ratification of Kerr-McGee's calculation practice and an intentional relinquishment of the right to assert a different method of calculating royalties.

As part of their cross-motion for summary judgment on these defenses, Lessors' attorneys submitted affidavits stating that they only became aware of Kerr-McGee's method of calculating royalties through the audit that led to this lawsuit. To counter this evidence, Kerr-McGee relies on letters and spreadsheets provided to Lessors in connection with the settlement of the Lessors' 1993 claims. Kerr-McGee asserts that these documents provided Lessors with notice of Kerr-McGee's method of calculating royalties under the amended royalty provision. As additional evidence of Lessors' knowledge, Kerr-McGee also points to Lessors' 1993 pleadings, in which Lessors made similar allegations that Kerr-McGee impermissibly deducted third-party transporting and treating charges from natural gas liquids. Initially, as with Kerr-McGee's quasi-estoppel defense, we fail to see how knowledge of Kerr-McGee's method of calculating royalties under the parties' prior agreement provided Lessors with notice of the same under the parties' amended agreement.

Even assuming that notice under the old agreement could somehow constitute notice under the amended agreement, we fail to see how the content

of Kerr-McGee's letters and spreadsheets put Lessors' on notice. While the spreadsheets contain a column showing "Value actually received from Valero" (presumably Kerr-McGee's third-party processor at the time), nothing in the spreadsheets indicate that Kerr-McGee calculated royalties based on that figure, or that they deducted transportation and fractionation expenses from Lessors' royalty. In fact, Kerr-McGee's handwritten notes on the document refer to "Royalty paid on actual natural gas liquid proceeds," which is consistent with Lessors' understanding of how the leases require Kerr-McGee to calculate royalties. Further, while the letter states that Kerr-McGee made clear to Lessors' attorneys that it would not agree to a settlement that made Kerr-McGee liable for royalties on revenue that Kerr-McGee did not receive, as discussed above, one reasonable construction of the parties' settlement amendment indicates that Kerr-McGee did eventually agree to such an arrangement. Accordingly, the district court properly granted summary judgment for Lessors' on Kerr-McGee's affirmative defenses of waiver and ratification.

The district court's judgment is AFFIRMED.